HANSON v. BURRIS et al.

No. 5486. Decided May 23, 1935. (46 [2d] 400.)
Rehearing Denied July 6, 1935.

*Soule & Spalding* and *S. R. Thurman,* all of Salt Lake City, for appellants.

*Charles D. Moore,* of Salt Lake City, for respondent.

MOFFAT, Justice.

The complaint herein pleads two causes of action: (1) The short form to quiet title; and (2) title to the property by virtue of purchase from Millard county after said county had acquired title thereto by purchase or foreclosure of tax lien for nonpayment of taxes, setting forth in detail the procedure from the tax levy through to sale and issuance of auditor's deed to the county and subsequent purchase by plaintiff from the county. The land described consists of 80 acres within the boundaries of the Millard county drainage district No. 3 in Millard county, Utah. The steps in the tax proceedings of assessment, levy, notice of due date, delinquency notice, sale, issuance of certificate of sale, failure to redeem, execution of auditor's tax deed, publication of notice of the May sale (so-called) and the sale and transfer of the described property by the county to plaintiff were alleged. The amount paid for the property including taxes for subsequent years from delinquency with interest and penalties is set forth. The plaintiff prayed that title to the property be quieted in him and for other relief.

Plaintiff joined in the action as defendants all parties who appeared of record to have any interest in the issues including the original owner, the mortgage holder, easement holders, judgment creditors, Millard county drainage district No. 3, and certain bondholders. All defendants defaulted except appellants Millard Realty Corporation, George S. Ingraham, Sherwood Green, and Edward P. McKenna. Ingraham, Green, and McKenna compose the bondholders' committee of drainage district No. 3. They

and the Millard County Realty Corporation, a bondholders' operating company, set up similar defenses. The drainage district did not appeal.

Four cases bearing more or less directly upon the same issues were argued together, and though the drainage district had not appealed, legal counsel appeared upon consent of all parties, filed a brief, and stated the position of the drainage district.

The amended answer of the appellants, after admitting some of the allegations of the complaint and denying others, sets out the organization of the defendant drainage district and the issuance and sale by the district on August 1, 1918, of drainage district bonds in the sum of $1,250,000. The form of the bond, the numbers, denominations, amounts, and dates of maturity are set out. All bonds issued are identical in wording and differ only in number, denomination, and date of maturity. Defendants alleged the drainage district was duly organized before the bonds were sold; that the drainage district estimated and equalized the assessment of drainage benefits under the Drainage Act of Utah, and set out in haec verba or in substance Comp. Laws Utah 1917, § 2055, relating to such proceedings; section 2057, relating to computing the drainage tax and placing the same upon the assessment roll; section 2058 relating to when drainage taxes become a lien, when delinquent, and the time and manner of collection; section 2071, relating to issuance of drainage district bonds; and section 2072, making the bonds a lien upon all lands within the drainage district; also the substance of sections 5910, 5912, 6010, 6016, 6018, 6020, and 6021, Comp. Laws Utah 1917. These latter sections provided how the county tax roll is made up by the county assessor, the delivery of the tax roll by the assessor to the county treasurer, the treasurer's duties in relation thereto, notices to taxpayers, publication of delinquent tax lists, notices of sale, time and manner of sales for delinquency, duties of the auditor and treasurer in relation to tax sales, issuance of tax sale certificates, form thereof,

and sales to the county with the recordation thereof. Sections 2055, 2057, 2058, 2071, and 2072, supra, are found in the chapter of the Compiled Laws relating to drainage districts; the other sections are found in the chapters relating to assessment and collection of taxes generally.

Appellants contend the amendment of section 2058, Comp. Laws Utah 1917, by chapter 47, Session Laws 1921, and chapter 109, Session Laws 1925, are unconstitutional and "the crux of this suit." Appellants reduce the controversy to one, as they assert, revolving "around the impairment of the obligation of contract under the Federal Constitution."

"Briefly it is the contention of appellants that there is under the taxing laws of Utah, as in the sections above indicated, but one annual tax roll or tax book in each County in which must be placed all of the taxes, both general and special, one notice of sale, one certificate of sale and one tax deed, in all of which instruments the general and special taxes must be included and both general and special taxes, when delinquent, must be sold at the same instant of time and when paid all taxes or none shall be paid and the treasurer shall issue but one receipt, which shall include receipt of payment for all of both general and special taxes. By special tax here we intend and include drainage taxes.

" * * * Under the above provisions of the Utah statutes which were in force and effect when these drainage bonds were sold, August 1st, 1918, each description of land with the ownership must be set out separately. Opposite this description must be itemized all state, county, school, road district, drainage district, and other special taxes, if any, and computed in one total sum of taxes due and that this total of taxes must be published in one notice and carried on through in the sale, certificate of sale and tax deed and that the sale for delinquent taxes must be for one lump sum, including all of these taxes.

"Much contention will be made in this cause over the construction of the words contained at the end of section 2055, Comp. Laws Utah 1917, which reads as follows: 'and it shall be the duty of the County Treasurer to collect such taxes *at the time and in the same manner* that the said county taxes are collected and pay the same to the treasurer of the Board of Supervisors as soon as moneys are received by him,' and the words in the last sentence of section 2058 which read as follows: 'Drainage taxes shall become due and delinquent *at the same time* shall be collected by the same officers and in the same manner as state and county taxes, and when collected shall be paid to the treasurer of the Board of Supervisors. (Italics appellants'.)  It

it the contention of appellants that the words 'at the time' and 'at the same time and in the same manner' can mean but one thing.

"These answering defendants further alleged that by and through the said amendments, of said section 2058, Compiled Laws of Utah, 1917, as hereinbefore alleged, and by and through the taxing proceedings carried on by the said county officials from the year 1921 to 1929, inclusive, hereinbefore alleged the State of Utah and said taxing officials have unlawfully impaired the obligation of contract between the defendant drainage district, these answering defendants and the State of Utah, as so provided by the statutes of the State of Utah, for the payment of drainage bonds, as aforesaid, in violation of section 10, article 1, of the Constitution of the United States and of section 1 of the Fourteenth Amendment to the Constitution of the United States; and in violation of section 7, 18, and 22 of article 1 of the Constitution of the State of Utah, and by reason thereof the said amendments to said Section 2058, in so far as the rights of these answering defendants and other holders of said drainage bonds, as herein set out, are unconstitutional and void and of no force and effect and a denial of the due process of law provisions of said Constitution.

"That in the year 1926, the lands described in plaintiff's complaint in Millard County, Utah, to-wit: West half of the Northwest quarter of Section 21, Township 16 South, Range 7 West, S. L. M. were subject to taxation for State, county, school and drainage taxes and the lien of said bonds as herein alleged and were in the manner hereinbefore alleged assessed for state, county and school taxes in one book and for drainage taxes in another and different book and, if any notices were served notifying landowners of said taxes, one separate notice was served upon the purported landowner of the land last described for the state, county, and school taxes and another separate notice was served, if any, on said purported landowners for the delinquent drainage taxes for that year on said last above described tract of land. Said state, county and school taxes went delinquent on said tract of land and the treasurer of Millard County caused a notice of sale of said lands for delinquent state and county and school taxes to be published, if any notice were published, fixing the time and the day for the sale of said lands for delinquent state, county and school taxes for the year 1926. Said drainage taxes went delinquent on said described tract of land for the year 1926 and the said County Treasurer caused a separate and different notice of the sale of said land for said delinquent drainage taxes to be published, if any notice at all were published, fixing a separate and different day for the sale of said lands for said delinquent drainage taxes for that year, and sold said lands for said state, county, and school purposes on one day and for said drainage taxes on a different day and caused one tax

sale certificate to issue to the purchaser for said delinquent state, county and school taxes and another and separate and different tax sale certificate to issue to the purchaser for the sale of the same tract of land for the delinquent drainage taxes, and after four years had expired, the said Auditor of Millard County issued one deed to the purchaser for said lands for said state, county and school taxes and another, different and separate deed to the purchaser for the said delinquent drainage taxes. The said tax notice, certificate of sale and Auditor's tax deed, made with reference to said state, county and school taxes did not mention nor include said or any drainage tax."

No question is raised by this appeal as to the regularity of the tax proceedings as to levy, notice, sale, issuance of certificate of sale, period of redemption, description of land, nor as to form or substance of any of the documents or records affecting the proceedings, except as may be drawn from the failure to adhere to what may be termed "unit proceedings," and "pay all or none," in collection and payment of taxes.

In appellants' language:

"We think it more convenient to consider these assignments together as they all revolve around the impairment of the obligation of contract under the Federal Constitution."

Appellants and respondent in their briefs and arguments have so treated the matter. The facts, as pleaded by the parties, were generally either admitted or proved, and no questions are raised thereon except as to ultimate ownership of the land. The trial court found in plaintiff's favor, concluded that the proceedings were regular, and that the lien for general taxes was superior to the lien for drainage taxes.

Appellants submit that if this court holds that the amendments to section 2058, Comp. Laws Utah 1917, impair the obligation of contract between the bondholders and the drainage district by providing a separate proceeding for

collecting drainage district taxes the other issues raised become immaterial; but that if this court holds that the said amendments to section 2058 and the proceedings thereunder do not impair the obligation of contract between the bondholders and the drainage district, it becomes material to inquire as to the "nature, character, extent and operation of the lien of the drainage bonds under the provisions of sections 2058, 2072, and 2073, Comp. Laws Utah 1917." Appellants further state:

"It is the contention of appellants that this Auditor's tax deed is null and void because it impaired the said obligation of contract, but if the court holds that it did not impair said contract and this court holds the said Auditor's tax deed was valid, and that the quit claim deed from Millard County to the respondent conveyed the title the county held to the respondent, it is the contention of appellants that the respondent took such title as he acquired, subject to the lien of the drainage bonds, the equalized assessment of drainage benefits and the delinquent drainage taxes levied after the year 1926; that the only effect of this tax deed was that it extinguished the drainage taxes levied prior to and including the drainage taxes for the year 1926, the year in which the land was sold for state and county tax, on which respondent's title is based; *but, that the drainage taxes assessed and levied against the lands beginning with the year 1927 and subsequent years has not been affected nor extinguished by the tax title respondent holds.*" (Italics added.)

In our view the fundamental and controlling issue is the nature, character, extent, and operation of the respective tax liens—the general tax lien on the one hand, the drainage tax lien on the other. It is claimed that the statute in force at the time the contract with the bondholders was made required that no taxpayer be permitted to pay any tax unless he pays all taxes, including the drainage taxes, and that there can be no redemption from such tax sale unless all taxes including the drainage taxes are paid. Any distinctions between a redemptioner, as defined by the statutes, and a purchaser of a county title after the period of redemption has expired are not involved. The plaintiff in this case is not a redemptioner within the terms of the statute, and such rights or title as he has come to him as a

purchaser from the county after expiration of the redemption period.

The regular redemption period is four years after the date of sale for taxes. Comp. Laws Utah 1917, § 6024, now R. S. Utah 1933, 80-10-59. Where property is sold to the county, it appears a further period of redemption is provided for by Comp. Laws Utah 1917, § 6056, amended by Laws Utah 1921, c. 140, p. 384; R. S. 1933, 80-10-68; Laws Utah 1933, c. 62, p. 111. In that section as last amended, after providing for the sale of real estate to which the county has received a deed because of sale to the county for delinquent taxes, the board of county commissioners during the month of May in each year is required to offer such property for sale. A detailed procedure is provided. It is then further provided:

"The board of county commissioners shall, at any time after the period of redemption has expired and before the sale as herein provided, permit the redemption of such property."

In case a situation arises where a county claims a lien for delinquent taxes and elects to proceed by foreclosure under sections 80-10-41 to 80-10-44, a period of redemption after sales upon execution is provided by R. S. 1933, 80-10-45.

Plaintiff in the instant case is a purchaser from the county at private sale after the county had taken the auditor's deed and offered the property at the May sale. Appellants recognize, as it is apparent they must, that the case of *Robinson* v. *Hanson*, 75 Utah 30, 282 P. 782, 783, does decide that taxes for general governmental purposes, lawfully imposed by the state, are paramount to all other demands against the property to which the tax lien attaches. If one person claims title under a drainage tax deed and another under a deed based upon a general tax lien, the proceedings in both instances being regular, the former must yield to the latter. The parties to this cause agree that the lien which supports the bonded indebtedness is extinguished by the tax deed to the county to the extent of all drainage taxes that have been levied or assessed before the county takes

title pursuant to sale for delinquent general taxes, and that a purchaser (not a redemptioner) from the county takes title from the county free and clear of all claims up to the time title is transferred from the county to the purchaser. This concession eliminates much from the discussion.

May the drainage district, after a sale by the county to a purchaser, not a redemptioner, and after the redemption period has expired, proceed to levy and collect drainage district taxes upon the land thus sold? Is the lien, securing the bonds, extinguished when the tax deed to the county is made? If not then, when, if at all? Lands within the drainage district are subject to assessment for maintenance and repairs, it is conceded. That there is a subsisting debt created by the issuance and sale of bonds to purchasers in good faith must be conceded. That such debt should be paid is admitted. Unless there is some fundamental principle or policy of the law that makes the contemplated method of payment impossible, or interferes with a sound public policy, the lien or the means whereby the debt may be liquidated and discharged should not be cut off as to the remaining balance of assessed benefits.

The situation is not the ordinary one of a breach of a contract between the parties to the contract. The refusal or failure of the landowner to pay his taxes has created a situation and set in motion a procedure, the consequence of which affects governmental functions and purchasers for value not parties to the creation of the original debt. Had the owner of the land at the time of the organization of the district and sale of the bonds done what it was anticipated he would do, this case would not have arisen. The landowner evidently in good faith voted in favor of the proceedings that created, pursuant to law, a drainage district, a body corporate and politic with the powers to do what was done. He may have subsequently in good faith concluded the land he held was not worth the assessed benefits and taxes and thereupon refused to pay. He had the same

option as to drainage taxes that he had as to general taxes, viz., pay or lose title. He could offer to pay or refuse to pay drainage or general taxes or both and abide the consequences. The original owner has in the instant case settled the "all or none" argument by electing to pay "none." When he chose to pay neither and accept the alternative of loss of his land, the further procedure referred to and provided by statute for the satisfaction of the tax claims was set in motion. There are at least three aspects to the problem: (1) The nature of the respective liens; (2) the procedure whereby the liens may be enforced and made effective; and (3) the result as to liens and title when the statutory procedure has been regularly pursued.

"It is a recognized principle of law that taxes for general governmental purposes, lawfully imposed by the state, are paramount to all other demands against the taxpayer, although the statute imposing the tax does not expressly declare such priority. This rule rests upon public policy and necessity. Civil government cannot exist or be maintained without revenues, and taxes levied by the state for its support are founded upon a higher obligation than other demands. It is essential to the dignity and power of the sovereign state that taxes levied by it be promptly collected without fail." *Robinson* v. *Hanson,* supra, and cases cited.

By the terms of the bonds sold by the drainage district, it acknowledges itself to owe the amount specified in the bond and promises to pay the bearer of the bond the sum specified therein, with interest. The principal and interest are made payable by taxes to be assessed and levied upon the lands embraced within the district and declared to be benefited to the amount determined by the improvement.

The bonds were dated the first day of August, 1918. The laws of Utah, as then existing, relating to drainage districts, entered into and formed a part of the contract "as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement." *Von Hoffman* v. *City of Quincy,* 4 Wall. (71

U. S.) 535, 550, 18 L. Ed. 403, 405; *Walker* v. *Whitehead,*
16 Wall. (83 U. S.) 314, 21 L. Ed. 357.

The levy of a tax and the enforcement of the lien created
by statute for payment of drainage bonds is an application
of certain governmental processes whereby money is raised
to pay a private debt. There is, therefore, a funda-
mental difference between the purposes and character
of the general tax lien and the drainage tax lien. One
is general, the other special. One is superior, the other is
inferior; one is governmental, the other private in char-
acter. The drainage tax lien upon the land within the dis-
trict is security for payment of the bonds sold, and when
collected or paid, pro tanto extinguishes the bond lien or
assessed benefits to the extent of payment, and when the
amount levied or assessed up to the limit of benefits upon
which the bond issue is based is paid, the lien is extinguished.
*Campbell* v. *Millard County Drainage Dist. No. 3,* 72 Utah
298, 269 P. 1023; *Elkins* v. *Millard County Drainage Dist
No. 3,* 77 Utah 303, 294 P. 307. Whether or not there is a
separate lien for state taxes, county taxes, school taxes, or
other taxes levied for governmental purposes, and whether
such liens attach in January (R. S. 1933, 80-10-1, 80-10-2,
80-10-3), in May (R. S. 1933, 80-5-30, 80-5-52), in August
(R. S. 1933, 80-9-1, 80-9-7), or at any other time, upon de-
fault in payment the net result is the same. Whether there
is one sale for general taxes and drainage taxes, one certi-
ficate of sale, one tax deed, there is no merger of the liens
or of funds derived therefrom. The one supports govern-
ment, the other pays a private debt.

The argument of plaintiff seems to assume that if the
bookkeeping in the county offices relating to taxes is kept
in one book, the valuation fixed as one total, one notice of
assessment, one notice of taxes due in one total, one notice
of delinquency including all taxes, general and drainage,
and one sale for delinquency and issuance of one certificate,
that such procedure would merge the tax liens, general and
drainage, into one. The argument would destroy the superi-

ority of the general tax lien and repudiate the concession made, and is contrary to the decision in *Robinson* v. *Hanson,* supra. The real difficulty is not that of procedure or sale. Whether procedure up to the time of sale and issuance of certificate is conducted jointly or separately could make no difference. Both liens are preserved and recognized, no matter what the procedure. If the landowner pays the general tax, the county will nevertheless sell for drainage taxes, and the drainage district may bid in the property and take title to it, subject to the taxes that may be levied and collected for general purposes. If, however, the landowner pays the drainage tax and neglects or refuses to pay general taxes, the county will nevertheless sell the property as it would for the drainage tax. The owner would lose title. The drainage district, the bondholder, any redemptioner to protect the lien, must pay the general tax, otherwise lose his lien and in time his right of redemption.

Where the taxpayer neglects or refuses to pay either, and the procedure has been carried on as appellants contend it should be, by the "unit" process, and sale for both drainage and general taxes and foreclosure of both liens "at the same time," and "in the same manner, pay all or none," what difference is there in result? Who takes title? The county or the district? There can be but one answer, and that is the county takes title subject to the right of redemption by any redemptioner as provided by law. Comp. Laws Utah 1917, § 6024, reads:

"Real estate sold for taxes may be redeemed by any person interested therein, at any time within four years after the date of the sale thereof, by such person paying into the county treasury for the use of the purchaser or his legal representatives the amount paid by such purchaser, and all penalties and costs as aforesaid, together with the sum of 50 cents for a redemption certificate, and all taxes that have accrued thereon and which have been paid by the purchaser after his purchase to the time of redemption, together with interest at the rate of 1 per cent per month on the whole from the date of payment to the day of redemption; provided, and when two or more parties are interested in a piece of property which has been sold for taxes, either party may redeem the property in which he is interested, upon a payment of that

portion of the taxes, interest, penalties, and costs which his property bears to the whole, together with the sum of 50 cents for redemption certificate."

The above section was amended and appears in R. S. 1933, 80-10-59, as follows:

"Real estate sold for taxes may be redeemed by any person interested therein at any time while the certificate of the tax sale is held by the county, within four years after the date of the sale thereof, by such person paying into the county treasury the amount due the county, including the sum of fifty cents for redemption certificate, all taxes subsequently assessed and all interest, penalty and costs that have accrued thereon; provided, that real estate sold and assigned as provided in section 80-10-36 may be redeemed by any person interested therein, at any time within four years after date of the sale thereof, by such person paying into the county treasury for the use of the assignee or his legal representatives the amount paid by such assignee, the sum of fifty cents for a redemption certificate, and all taxes that have accrued thereon and which have been paid by the purchaser after his purchase to the time of redemption, together with interest at the rate of one per cent per month on the whole from the date of payment to the day of redemption."

And was again amended by Laws Utah 1933, ch. 61, p. 111, to read:

"Real estate taken over by the county for delinquent taxes may be redeemed by any person interested therein at any time while the certificate of tax sale is held by the county, within four years after the date of the sale thereof, by such person paying into the county treasury the amount due the county, including the sum of fifty cents for redemption certificate, all taxes subsequently assessed and all interest, penalty and cost that have accrued thereon; provided, that where any real estate is taken over by the county and remains unassigned, the date provided by law for redemption may be extended for an additional year upon payment, at any time within the redemption period, of an amount equal to that part of the delinquent tax which is four years delinquent plus penalty, plus interest accrued on such part of the delinquent tax; provided further, that real estate sold and assigned as provided in section 80-10-36 [Laws Utah 1919, c. 122, p. 339, Comp. Laws Utah 1917, § 6023] may be redeemed by any person interested therein, at any time within four years after the date of the sale thereof, by such person paying into the county treasury for the use of the assignee or his legal representatives the

amount paid by such assignee, the sum of fifty cents for a redemption certificate, and all taxes that have accrued thereon and which have been paid by the purchaser after his purchase to the time of redemption, together with interest at the rate of 8% per annum on the whole from the date of payment to the day of redemption.

"The county treasurer shall accept and credit on account for the redemption of property sold for delinquent taxes, at any time prior to the expiration of the period of redemption and thereafter until the date of the public sale provided for in 80-10-68, payments in amounts of not less than $10 except the final payment which may be in any amount. For the purpose of computing the amount required for redemption and for the purpose of making distribution of the payments received on account hereof, all such payments shall be applied in the following order:

"First, against the interest accrued upon the delinquent tax for the last year included in said delinquent account at the time of payment;

"Second, against the penalty charged upon the delinquent tax for the last year included in the delinquent account at the time of payment;

"Third, against the delinquent tax for the last year included in the delinquent account at the time of payment;

"Fourth, against the interest accrued upon the delinquent tax for the next to last year included in the delinquent account at the time of payment;

"And so on until the full amunt of the delinquent tax, penalty and interest upon the unpaid balances shall have been paid within the period of redemption as aforesaid."

The county cannot be a redemptioner from itself nor for the other governmental units for which the county collects general taxes. Construing section 6024, Comp. Laws 1917, in the case of *Sorensen* v. *Bills,* 70 Utah 509, 261 P. 450, 451, the court said:

"The owner of the property, within the period allowed for redemption, had redeemed the property from that tax sale, and thereafter any right that the county had by reason of the levy and the tax in the year 1917 was extinguished to the same extent that its claim would have been had the taxes been paid prior to the delinquent tax sale. * * * "

When the period of redemption has expired and the county has received a tax deed for any real estate sold for delin-

quent taxes, the county tax lien merges into the title as effectively as by execution sale with such further rights of redemption as the statute provides. Purchasers from the county then take with a "new and complete title in the land, under an independent grant from the sovereign authority, which bars or extinguishes all prior titles and incumbrances of private persons, and all equities arising out of them." *Hefner* v. *Northwestern Mut. Life Ins. Co.*, 123 U. S. 747, 8 S. Ct. 337, 338, 31 L. Ed. 309, citing *Crum* v. *Cotting*, 22 Iowa 411; *Turner* v. *Smith*, 14 Wall. 553, 20 L. Ed. 724. Bondholders or others having liens who desire to protect them and prevent their being cut off must do so as any inferior lienholder; that is, pay the superior lienholder's claim. They may protect their security either by paying the taxes before sale or redeeming the land after sale at any time before the expiration of the period of redemption. The lien of the bondholders is of necessity extinguished when the county takes the title. The purchaser from the county (not a redemptioner) takes title free and clear of liens, otherwise the county would be hampered in collection of taxes and prevented from again having the property returned to the assessment rolls. The bonds are not general obligations of the district, "but are a charge against the lands within the district, and * * * delinquent assessments for the payment of the bonds and interest may not be included in future assessments made against the other lands of the district. The lands remain liable, however, to assessment for maintenance and repairs." *State ex rel. Malot* v. *Board of County Commissioners of Cascade County*, 89 Mont. 37, 296 P. 1, 19.

In what way, if at all, have the amendments to section 2058 affected the procedure or effectiveness of the remedy applicable when the bonds were sold? There are really two procedures, one relating to the levy of taxes and procedure up to payment, and another in the event the taxpayer fails to pay. When he fails to pay, the second and further procedure is set in motion. If all the

taxes are paid, the second series of procedural steps relating to foreclosure or extinguishment of the landowner's title does not become operative. If he fails to pay, then the state or the county on behalf of the state must proceed to clear the land of liens and get it back into private hands for taxation purposes in support of government.

The statutes of this state accord to the holder of a lien on land—whatever the type of lien—the right to pay the general taxes and redeem the property if the landowner fails to pay. The holder of a mortgage then has his opportunity, and if he neglects or refuses to pay the general taxes levied against the land upon which he holds a mortgage, the land may go to tax sale. If he then permits the redemption period to expire and the title to become vested in the county or a purchaser after the redemption period expired, his mortgage lien is extinguished, although the contract and debt obligation between the mortgagor and mortgagee may still subsist. The same principle applies to special assessment liens for local municipal improvements. The same principle must of necessity apply to drainage tax assessments or liens. *State ex rel. Malott* v. *Board of County Commissioners of Cascade County*, supra.

Among the federal cases cited is that of *Moore* v. *Gas Securities Co.* (C. C. A.) 278 F. 111, 122, in which many of the other cases analyzed and submitted by appellants are referred to. The case of *Moore* v. *Gas Securities Co.* is put upon a different basis than the statutes and former decisions of this court permit. In that case the liens are held to be equal. Instead of the taxes for general purposes being held as superior, the Circuit Court of Appeals, citing a Colorado case says:

"The statute thus clearly set forth the remedy which the law gave to the holder of the bonds for their collection and became a part of the contract between him and the district. *The taxes which were to be levied and paid for his benefit were coupled with and put on the same footing as county taxes. Nile Irrigation District* v. *English,* 60 Colo. 406, 409, 153 P. 760." (Italics added.)

The Nile Irrigation District Case cited contains the following statement at page 761 of the Pacific Reporter citation:

"We see no reason why taxes regularly assessed and levied for the use and benefit of a duly organized and lawfully existing irrigation district are not of equal validity and dignity with, or why they should not be respected and enforced the same as other taxes."

In the concluding lines of the opinion in the case of *Moore* v. *Gas Securities Co.,* supra, the following appears:

"The mode of procedure now adopted is a discrimination against district taxes by which they are put on a lower level than other taxes. Under the prior remedy there was compulsion on the taxpayer to pay all or none, and with it the patriotic impulse to promptly meet all just obligations to sustain schools, and state and county governments. Of course, the Legislature was not without power to change the remedy, but in doing so it was obliged to give the bondholder some other equally adequate remedy, otherwise it would impair the obligation of his contract with the district. *Von Hoffman* v. *City of Quincy,* 4 Wall. 535, 18 L. Ed. 403; *Walker* v. *Whitehead,* 16 Wall. 314, 21 L. Ed. 357; *Tennessee* v. *Sneed,* 96 U. S. 69, 24 L. Ed. 610; *New Orleans C. & L. R. Co.* v. *State of Louisiana ex rel. City of New Orleans,* 157 U. S. 219, 15 S. Ct. 581, 39 L. Ed. 679; *Seibert* v. *Lewis,* 122 U. S. 284, 7 S. Ct. 1190, 30 L. Ed. 1161."

As heretofore decided by this court, drainage taxes in this state are "put on a lower basis than other taxes" levied and assessed for governmental purposes. *Robinson* v. *Hanson,* supra. The last seentence of section 2055, Comp. Laws Utah 1917, reads:

"The board of county commissioners shall sit as a board of equalization of district drainage taxes, and shall equalize and finally determine the assessments to be made and levied upon each tract of land within the district, *at the time and in the manner* provided for by law for equalizing state and county taxes, and shall thereupon certify the same to the county treasurer of the county within which such district is located; the county treasurer shall enter the same in the tax rolls in the county, and it shall be the duty of the county treasurer to collect such taxes *at the time and in the same manner* that the said county taxes are collected, and to pay the same to the treas-

urer of the board of supervisors as soon as moneys are received by him." (Italics added.)

The amendment adding to and repealing parts of the drainage district law (chapter 41, Laws Utah 1919) amended section 2055 to read:

"The Board of Supervisors shall, on or before the first Monday in March of each year, prepare a statement and estimate of the amount of money to be raised by taxation within said district for the purpose of constructing canals, drains, drain ditches, and other works, and maintaining the same; liquidating district warrants and notes and paying interest thereon, paying the interest on the bonded indebtedness of the district; creating a sinking fund for redeeming such bonds; meeting all payments due or to become due under any contract between the district and the United States; and for the purpose of maintaining and repairing drainage canals, flumes, and conduits, bridges, culverts and other works within said district; and for the management and control of such drainage system; and shall levy the entire amount required in each year against the lands within said district in proportion to the equalized benefits and after adding 15 per cent of each amount to the respective assessments to provide for incidentals and possible delinquencies, shall certify the same to the county assessor of the county within which such district is located."

It is to be noted all reference to the equalization and collection of taxes is omitted from the new section 2055. It is also to be observed that section 2058, Comp. Laws Utah 1917, which reads as follows:

"All drainage taxes levied and assessed under the provisions of this title shall attach to and become a lien on the real property assessed from and after the second Monday in March. *Drainage taxes shall become due and delinquent at the same time and shall be collected by the same officers and in the same manner as state and county taxes, and when collected shall be paid to the treasurer of the board of supervisors*" (italics added),

was omitted from chapter 41, Laws of Utah 1919. Section 2045, Comp. Laws 1917, and all laws and parts of laws in conflict with the provisions of chapter 41 were repealed. In 1921 certain sections of the drainage district law were

amended (Laws 1921, c. 47) among which was section 2058, Comp. Laws 1917. It reads as amended:

"All drainage taxes levied and assessed under the provisions of the title shall attach to and become a lien on the real property assessed from and after the second Monday in March. Drainage taxes shall become due and delinquent at the same time, and shall be collected by the same officers and *in the same manner and at the same time* as state and county taxes, and when collected shall be paid to the treasurer of the board of supervisors. The revenue laws of this state for the assessment, levying and collecting of taxes on real estate for county purposes, except as herein modified, shall be applicable for the purposes of this Act, including the enforcement of penalties and forfeiture for delinquent taxes; provided, that lands sold for delinquent district taxes shall be sold separately for such tax and a separate certificate of sale shall issue therefor. On or before the second Monday in December of each year, the county treasurer must publish a delinquent list, which must contain the names of the owners, when known, and a description of the property delinquent or subject to lien of drainage district taxes with the amount of taxes due exclusive of penalty. The county treasurer must publish with such a list a notice that unless the delinquent drainage taxes, together with the penalty, are paid before third Monday of December next thereafter, the real property upon which such taxes are a lien will be sold for taxes, penalty and costs, beginning on said date, at the front door of the county courthouse. The delinquent list shall be published three times if in a daily newspaper, twice if in a semi-weekly and once if in a weekly newspaper, commencing on or before the second Monday in December. On the third Monday of December of each year, the county treasurer shall expose for sale between the hours of ten A. M. and three P. M., sufficient of all delinquent real estate to pay the drainage district taxes, penalty and costs for which such real estate is liable, at public auction, at the front door of the county courthouse, and sell the same to the highest responsible bidder for cash, and the treasurer shall continue to sell from day to day between such hours until the property of all delinquents is exhausted or the taxes, penalty and costs are paid. In offering such real estate for sale, the treasurer shall offer the entire tract assessed, and the first bid received in an amount sufficient to pay the taxes and costs shall be accepted unless a further bid in the same amount for less than the entire tract shall be received; and the highest and best bid shall be construed to mean the bid of that bidder who will pay the full amount of the taxes and costs for the smallest undivided portion of said real estate. After receiving a bid for the full amount of the taxes and costs it shall not be the duty of the treasurer to attempt to secure a higher bid, but he shall accept

it if made. The treasurer shall make a record of all sales of real property in a book to be kept by him for that purpose therein describing the several parcels of real property on which the taxes and costs were paid by the purchasers, in the same order as the published list of delinquent sales contained in the list of advertisements on file in his office. Separate columns shall also· be provided in said record in which the treasurer shall enter the description of any tract sold that is less than the entire tract on which the taxes are due, the date of sale, to whom sold, the penalty, and costs, and the date of redemption. The purchaser shall be required to pay the penalty to the treasurer, which penalty shall in all cases accrue to the benefit of the drainage district. When all sales have been made the treasurer shall file the record in his office, in loose-leaf bound form. It shall be the duty of the county treasurer to issue a receipt to any person paying drainage district taxes on an undivided interest in real estate, showing the interest on which taxes are paid, and in case any portion of the drainage district taxes on such real estate remains unpaid, it shall be the duty of the treasurer to sell only such undivided interest in said real estate as belongs to the co-owners who have not paid their portion of the taxes. In absence or default of purchaser at any such public sale of drainage district taxes, the drainage district in which taxes are delinquent may purchase upon the same terms as any individual purchaser the real estate upon which drainage district taxes are delinquent and shall hold the same in the same manner as a county or an individual may hold lands upon which state or county taxes are delinquent, subject to the same rights of redemption. In all respects, a drainage district shall be the beneficiary of taxes assessed and levied by it, provided, however, that the county treasurer shall retain the costs and expense provided by law for the advertisement, sale and redemption of drainage district taxes. All lands upon which drainage district taxes have become delinquent, before the passage of this Act whether such lands have been purchased by the county or not shall be sold as provided herein by the county treasurer on the third Monday in June, 1921, after like advertisement and notice as provided herein has been given to the owners thereof, and upon the same terms and conditions as herein provided."

The words *"at the same time"* which were contained in section 2055, Comp. Laws 1917, and not found in the 1919 amendment nor in section 2058, Comp. Laws 1917, were restored to section 2058 when the section was amended in 1921 and 1925, and thereby a procedure was expressly provided for the collection of drainage district taxes.

The changes made in sections 2055 and 2058 by the amendments of 1919, 1921, and 1925 are by appellants maintained to be the changes that work an impairment of the obligation of the bondholders' contract and infringe the constitutional provisions relating thereto. With this view we are unable to concur. The manner by which the drainage tax lien is made effective for the purpose of reaching the security to which the bond lien attaches is substantially the same since the amendment as before, even considering the statutory references in the drainage tax law as making the procedure for the collection of general taxes applicable. By the procedure prescribed, no added burden is placed upon the drainage district nor the bondholder whereby the lien provided by the statute is impaired, nor is it made more difficult of enforcement. When the contract relating to the sale of the drainage district bonds was entered into, it was entered into with reference to the law as it then existed. The law as it then existed was in contemplation of the parties. The land within the drainage district was and always would be subject to being taken for the nonpayment of general taxes. That the lien for general taxes was superior to the lien for drainage district taxes was as much the law then as it is now. No right to pursue and make effective the drainage tax lien has been taken away or impaired. In the event of failure to pay either drainage or general taxes, the officers charged with the duty of collecting those taxes pursue the methods provided by law until the landowner's title is extinguished. Between the time of sale and expiration of the redemption period, and during which there is outstanding a certificate of sale for both delinquencies for nonpayment of general and drainage taxes, the drainage district may pay general taxes and take tax sale certificate. After the period of redemption has expired, the drainage district, upon payment of the general taxes, is entitled to a deed vesting it with title to the property sold for drainage taxes, if general taxes have been paid and drainage taxes have not. This is the ultimate limit to which the drainage

district and the bondholders were entitled to go at any time, whether before or after the amended statutes. Had the Legislature declared the drainage lien paramount to the general tax lien, and by a procedure subsequently enacted the Legislature had sought to reduce or render subordinate the drainage tax lien, a different question would be presented.

"The obligation of a contract is the law which binds the parties to perform their agreement. *Sturges* v. *Crowninshield*, 4 Wheat. 122, 197, 4 L. Ed. 529; Story, op. cit., 1378. This Court has said that 'the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement. * * * Nothing can be more material to the obligation than the means of enforcement. * * * The ideas of validity and remedy are inseparable, and both are parts of the obligation, which is guaranteed by the Constitution against invasion.' *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, 550, 552, 18 L. Ed. 403. See, also, *Walker* v. *Whitehead*, 16 Wall. 314, 317, 21 L. Ed. 357. But this broad language cannot be taken without 'qualification. Chief Justice Marshall pointed out the distinction between obligation and remedy. *Sturges* v. *Crowninshield*, supra, 4 Wheat. 122, 200, 4 L. Ed. 529. Said he: 'The distinction between the obligation of a contract, and the remedy given by the legislature to enforce that obligation, has been taken at the bar, and exists in the nature of things. Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct.' And in *Von Hoffman* v. *City of Quincy*, supra, 4 Wall. 535, 553, 554, 18 L. Ed. 403, the general statement above quoted was limited by the further observation that 'it is competent for the States to change the form of the remedy, or to modify it otherwise, as they may see fit, provided no subsantial right secured by the contract is thereby impaired. No attempt has been made to fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances.' And Chief Justice Waite, quoting this language in *Antoni* v. *Greenhow*, 107 U. S. 769, 775, 2 S. Ct. 91, 96, 27 L. Ed. 468, added: 'In all such cases the question becomes, therefore, one of reasonableness, and of that the legislature is primarily the judge.'" *Home Building & Loan Ass'n* v. *Blaisdell et al.* 290 U. S. 398, at page 429, 54 S. Ct. 231, 237, 78 L. Ed. 413, 88 A. L. R. 1481.

That neither general nor special taxes have been paid does not alter the relative positions as to the superiority of the liens. The drainage tax lien must suffer the same fate as all other inferior liens unless it is protected before the period of redemption expires. This, of necessity, is the result, otherwise the collection of taxes levied for carrying on the functions of government would be hampered and interfered with.

The amendments of 1921 and 1925 about which appellants complain, in so far as a procedure not before provided is concerned, are in some respects enlargements of power. More effective methods whereby the bondholders' remedy to reach the security available in satisfaction of the indebtedness are provided. At no time could the drainage district or the bondholder rest upon the presumption that his security would remain unimpaired as against the right of the state to levy and collect taxes for governmental purposes. The necessary steps must always be taken to maintain the effectiveness of a lien while the oppotrunity is open. The remedy under the amended statute is as adequate as the remedy before the statute was amended.

When it was determined that the tax lien for governmental purposes was superior to all other liens (*Robinson* v. *Hanson,* supra), the fundamental issue of the case was decided. No reason for departing from the doctrine of that case is suggested. When the drainage district was organized and the bonds sold, the taxpaying procedure relating to reaching the property assessed and benefited was made available. The procedure whereby the land so benefited can be reached and applied is still available. No change in the relative status of the taxing units has been made as to the ultimate purpose to be reached, nor as to the effectiveness thereof.

This is an action to quiet title of the plaintiff in the described tract of land. The answer broadened the scope of the inquiry and included the issues we have discussed.

The trial court was invited to make findings upon those issues. As presented upon this appeal and upon the questions raised, we are of the opinion the amendments to the statutes are not subject to the attack made. We find no reversible error.

The judgment is therefore affirmed. Costs to respondent.

EPHRAIM HANSON, Justice.

I concur.

ELIAS HANSEN, Chief Justice.

I concur in the results.

WOLFE, Justice (concurring).

I agree in the results reached in the prevailing opinion, but prefer to state my own reasons. The plaintiff, respondent here, filed this action seeking to quiet title against all the defendants to a tract of 80 acres within the boundaries of Millard county drainage district No. 3, which is a part of Millard county, Utah. The plaintiff alleged that the general taxes for the year 1926 were not paid, and as a result a tax deed to the property was taken by Millard county and by the county conveyed to him. It appears that a certificate of sale was issued to the county on the 28th day of May, 1927, and auditor's tax deed delivered to the county on March 25, 1931; that the property was offered by the county for sale in May, 1931, and, not being sold at public auction, was thereafter, on June 5, 1931, sold by the county to the plaintiff through the action of the county commissioners. The plaintiff was in no way connected with the title to the land in controversy until he made the purchase and received a quitclaim deed on June 6, 1931. This action was brought on October 28, 1931. The plaintiff alleged his cause of action in two counts (denominated in the complaint as causes of action), one involving the short form for quieting title and the second based on the tax proceedings enumerating the various steps taken by the tax offi-

cials which resulted in the tax deed and tax title upon which plaintiff relies for the title and right of possession.

The defendants George S. Ingraham, Sherwood Green, and Edward P. McKenna (bondholders' committee of district No. 3) and the Millard Realty Company, the operating company of the bondholders, alone answered. The other defendants, including the Millard county drainage district No. 3, defaulted. The answer sets out that Millard county drainage district No. 3, about the 17th day of November, 1917, was duly organized as a drainage district and body politic and corporate under and by virtue of title 26, Comp. Laws Utah 1917; that on the 16th day of March, 1918, a majority of the owners of lands within the drainage district voted in favor of and authorized the issue of coupon bonds of said district in the amount of $1,250,000 for the purpose of constructing a drainage system on the lands located in said district, and that pursuant to such authorization the board of supervisors of said district on or about the 1st day of August, 1918, did execute, issue, sell, and deliver to purchasers the bonds of said drainage district in the sum of $1,250,000 payable to bearer, dated August 1, 1918, numbered consecutively and issued payable in series annually from 1928 to 1938. The form and substance of the bonds is set out as Exhibit A to the answer, and such parts as are material will be adverted to later in this opinion. The answer sets out that the defendants are the owners of $175,000 in par value of said bonds, all of which are now due and unpaid, giving the numbers and denominations of said bonds, the maturity dates being August 1, 1929, 1930, and 1931. The answer further alleges—and all of these facts are found to be so in the findings of fact of the lower court—that there are approximately 43,000 acres of land in said drainage district upon which benefits have been "assessed." The net benefits available for the payment of said bonds and "assessed" against these 43,000 acres of land at the time of the issuance of the bonds was $2,536,006.73, or about twice the amount of the bond issue.

Approximately 2,500 acres of this land still have a margin of $25 an acre before the limit of "assessed" benefits is reached. The rest of the land has at least $50 per acre margin before this limit is reached; that the full "assessed" benefits at the time of the issuance of the bonds was $60 per acre.

At the time the bonds were issued there was in force and effect section 2058, Comp. Laws Utah 1917, which, being short, we shall quote in full as follows:

"All drainage taxes levied and assessed under the provisions of this title shall attach to and become a lien on the real property assessed from and after the second Monday in March. Drainage taxes shall become due and delinquent at the same time and *shall be collected by the same officers and in the same manner as state and county taxes,* and when collected shall be paid to the treasurer of the board of supervisors." (Italics ours.)

Said section was by the Legislature of 1921 amended as set out in chapter 47, Laws of Utah 1921, by adding, among other things, the following:

"* * * The revenue laws of this state for the assessment, levying and collecting of taxes on real estate for county purposes, except as herein modified, shall be applicable for the purposes of this Act, including the enforcement of penalties and forfeiture for delinquent taxes; provided, *that lands sold for delinquent district taxes shall be sold separately for such tax and a separate certificate of sale shall issue therefor.*" (Italics added.)

It was also provided that the taxes should be collected, not only in the same manner as provided by the original section 2058, but should be collected at the same time as state and county taxes. Then follows procedure for the publication and sale of delinquent drainage taxes.

By chapter 109, Laws of Utah 1925, section 2058 was again amended by adding after the word "therefor," as contained in the above quotation from the 1921 laws, the following words: "And provided further that the period of redemption from sale for taxes under this Act, shall be four years." These changes in the law, as we shall see

later, are very material to the contention made by the defendant appellants.

In the year 1919 (the first year after the bonds were issued), the county treasurer sent tax notices to the landowners in said district containing both the amount of general taxes for state, county, and school purposes and the amount of the taxes levied for drainage purposes. He published one notice of sale for both the general taxes and the delinquent drainage taxes and held one sale for the two. The county treasurer gave one certificate of sale to the purchaser or to the county covering a sale for both taxes. After the said year of 1919 and beginning with 1920 the county treasurer sent out separate notices to the landowners in the district, one of which contained the general taxes and the other of which contained the annual assessment for drainage purposes, called drainage taxes. Delinquent general taxes and delinquent drainage taxes were separately published, and the land separately sold, and separate certificates of sale were given. After four years from the sale an auditor's deed was given to the purchaser of the land for general taxes and a separate auditor's deed given to the purchaser or drainage district (whichever held the certificate) on failure to redeem for drainage taxes. Separate sales were made in May as provided in section 6056, Comp. Laws Utah 1917, and amendments thereto (Laws 1921, c. 140). In short, in the year of 1919 the general and drainage taxes were coupled together and treated as far as tax procedure is concerned as an integral whole. In 1920, one year before the amendment of 1921, the procedure went through separate channels, the two being separated at least from the point of sending out tax notices all the way down to final disposal of delinquent land to a private owner, which would be more than four years after the year in which the tax was assessed. In 1921 and succeeding years the same separate procedure was followed, the amendment of 1921 specifically ordaining such procedure.

The facts above set out give the main background to make intelligible the contentions of the parties, and with the several additional facts which may be set out later in the course of this opinion are sufficient to pose the questions of law involved in this appeal.

Appellants attack the plaintiff's tax title by attempting to lay the axe at its roots, in that they contend the quitclaim deed of June 6, 1931, from the county was invalid. This contention is in turn based upon the contention that the procedure set out by the amendments of 1921, especially in the procedure set out in section 2058 of the amendment of 1921, impaired the obligation of contracts, and therefore, as to the appellant bondholders, the procedure was invalid. This turns on the contention that when the drainage bonds were issued on August 1, 1918, the procedure then in force under the 1917 Compiled Laws was a part of the bondholders' contract and that any change which gave a less efficacious remedy for collection of the annual interest and sinking fund installments collectible from the owner of any tract of land was invalid, and that the amendment of 1921 was a substantial impairment of such procedure which had been given to the bondholders under the 1917 law. Note will be taken of the fact that the appellants do not attack the alleged tax title of the plaintiff on the ground that there was any irregularity or invalidity in the various steps taken, in that they were not in conformity with the procedure laid down by law at the time the steps were taken, but that said changed procedure itself effected an impairment of the obligation of contracts. Note will be further made of the fact that the previous owner of the land against whom the taxes were assessed is not a party, and that the procedure as to him is not claimed to be invalid. An act may be unconstitutional as to one party whose contract it allegedly impairs and not as to other parties differently situated. Since the contention is that it was an impairment of the bondholders' contract, it could be unconstitutional as to the bondholders and yet not unconstitutional as far as the owner

against whom the lands were taxed is concerned. The previous owner of the lands in this case is not in anywise concerned in this appeal.

The second contention made by the appellants is that even though the title in the plaintiff based on the quitclaim deed from the county is good, still the lands covered by the quitclaim deed, of necessity physically remaining in the drainage district were liable for their share of the annual assessment of principal and interest of the bonds still to be collected during the remaining life of the bonds. The appellants do not contend, if the quitclaim deed is valid, that it did not discharge those socalled drainage taxes which were a lien upon the land before the auditor's deed to the county. At this time it should be stated that the Millard Realty Corporation, defendant and appellant, acquired a judgment on the bonds in default which it held. It is claimed by the respondent that this judgment, if it was ever a lien against the land owned by Johnson, now claimed to be owned by the plaintiff, was discharged by the auditor's deed to the county. The respondent contends that this land is subject to no future drainage taxes after the giving of the auditor's deed, on the theory that the entire liability for drainage taxes was discharged by the auditor's deed given in pursuance of the delinquency of general taxes.

These are the questions which divide the parties. The plaintiff's answer to the contention of the appellants that the 1921 amendment worked an impairment of the obligation of the contract between the bondholders and the drainage district is twofold: First, that the 1921 amendment did not change the method contained in section 2058, Comp. Laws 1917, but only clarified it; that the method before and after the amendment of assessing, giving notice, collecting, and the procedure upon delinquency were the same. Second, that even if there was a change in the method of procedure of assessing and collecting taxes by the 1921 amendment, the same did not impair the obligation of the contract because there was no substantial diminution of

the rights of the bondholders; that, upon analysis, in the actual practical results in the collection of taxes before and after the amendment, even though there may have been a change from lumping the drainage and the general taxes together to one of separating them in their collection, whether delinquent or otherwise, the bondholders suffered no substantial injury or impairment in the collection of the so-called drainage taxes.

We shall take up these questions in the order presented. First, did the 1921 amendment actually change the method of levying and collecting the drainage taxes as compared with that which pertained before the amendment? It is the contention of the appellants that the language in section 2055, Comp. Laws 1917, reading, "and it shall be the duty of the county treasurer to collect such taxes [that is, drainage taxes] *at the time and in the same manner* that the said county taxes are collected, and to pay the same to the treasurer of the board of supervisors as soon as moneys are received by him," and the italicized part of the language of section 2058 Comp. Laws 1917, as set out at the beginning of this opinion, draw into the drainage law the provisions of the following sections of the Compiled Laws of 1917, to wit, sections 5910, 5912, 6010, 6012, 6015, 6016, 6018, 6020, 6021, 6023, 6024, 6030, 6054, 6055, and 6056. It would unprofitably lengthen this opinion to set out even the substance of these sections. They encompass nearly every step in the tax procedure relating to the making up of the assessment book, giving of notices and what the notices should contain, the indexing of property owners assessed, the giving of tax receipts, publication of the delinquent list, the sale of property for delinquent taxes and keeping a record of the same, the issuance of certificates of sale and the form of the same, the manner of redemption, auditor's deed, sale of lands held under auditor's deed, the distribution of moneys received from sale or redemption among the various taxing units entitled, etc. Some of these sections, especially sections 6010, 6012, 6021, and 6055 contain language which

appellants contend recognized that there were taxing districts other than the state, county, cities, and school districts which were interested in the taxes collected. That from the form of notice providing for the setting down in columns the tax due each taxing unit and leaving blank columns for other units, and from the requirement that "taxes levied on a certain kind or class of property for special purposes other than for state, county, city, town, and school purposes, etc., shall be separately set out," have a purpose which shows that there was contemplated the collection of these drainage taxes together with the general taxes in one lump sum.

The appellants contend that the result of the requirement that the drainage taxes be collected at the time and in the same manner that the county taxes are collected is that the drainage and county taxes (and by county taxes was meant all of the general taxes for state, county, city, school, and school district purposes) were irretrievably coupled to be collected as a lump sum; that all or none must be paid; that no sale could be made under section 6018 unless the purchaser paid both sets of taxes; that no redemption could be had unless the redemptioner paid all of both drainage and county taxes; and that no assignment of the county certificate of sale could be made unless the purchaser paid both sets of taxes with penalties and costs. According to this contention, the drainage taxes fixed themselves upon the general taxes for governmental purposes, and that such was part of the contract between the district and the bondholders; that such contract cannot be altered so as to provide that the procedure may be separate if that results in an opportunity to pay the general taxes without the drainage taxes, which not only means the withdrawal of the inducement and necessity of paying the drainage taxes in order to be free of the lien for general taxes, but actually means that the lien for installments of drainage taxes already accrued could be wiped off simply by the auditor's deed to the county for general taxes.

The respondent answers these contentions by the simple contention that the words "at the time" mean not at the same moment or instant of time, but during the same period of sale. That is, that the requirement is only upon the treasurer to sell for drainage taxes during that period in which he is offering the property for delinquent general taxes, and that the words "in the same manner" mean that the manner of doing it must be the same, but not that they must be one and the same act. As to which party is correct in his contention must be ascertained by determining what was intended by the Legislature when it used the words "at the time" and "in the same manner."

Ordinarily, when the Legislature amends a statute, the supposition is that it meant to change the law in the respects amended as compared to what it was before the amendment, and not that it simply meant to clarify or remove an ambiguity. Concretely applied to this situation, it would mean that the Legislature, by the amendment of 1921, construed the act before the amendment as not permitting of paralleling the procedure in regard to the two sets of taxes, but that there must be but one procedure covering both taxes. The fact, too, that section 6055, dealing with the distribution of taxes received from redemption, provided they must be apportioned to the state, county, city, town, school district, and *other taxing districts interested*, supplies grounds for the argument that it was contemplated that there were other taxing districts than those specifically mentioned, and that these taxing districts would be irrigation and drainage districts. These words may have been inserted out of an abundance of caution or to cover future taxing districts created by the Legislature for governmental purposes. It is noteworthy that in the 1896 laws, section 149 of chapter 129, which corresponds with section 6055, Comp. Laws 1917, the proceeds from redemption were divided between the county and state only. At that time cities collected their own taxes. In the revision of 1898 these words, "and other taxing district interested," first appear.

In the same section (section 2654, R. S. Utah 1898) the proceeds for redemption are to be divided between the state, county, city, town, school district, and other taxing districts interested. By the revision of 1898 the county treasurer became the collector for cities as well as other taxing districts, and in including the new governmental district for which he became collector, the Legislature may have, as a catch-all, included the words "other taxing districts interested," thus intending to cover any omission of governmental districts not specifically mentioned. This would give an office for the phrase without it being intended to apply to drainage districts.

The fact that section 6021, providing for the form of certificate of sale, leaves blanks and blank columns for the insertion of other types of taxes than those specifically mentioned gives color to the argument that there were to be included other types of taxes which may include drainage districts. The fact that section 6010 provides that the treasurer shall set out separately all taxes levied on a certain kind or class of property for a special purpose or purposes and that section 6012 provides that receipts for such taxes shall also be separately set out, gives additional weight to the argument. Both sections 6010 and 6012 in their essence were passed in the same year as the first drainage district law, that is, in 1896. The Legislature may have had in mind only such special taxes as were for governmental purposes and which arose from the direct ad valorem assessment of property. While the word "taxes" is used to denote the annual installments necessary to raise sinking fund and interest requirements of a bond issue in a drainage district, as well as for maintenance and improvements, and management of the drainage district, yet such impositions are not strictly a tax. They are repayments by the taxpayer for benefits conferred upon his land. They are impositions for special improvement. *State* v. *Corinne Drainage Dist. of Box Elder County*, 48 Utah 1, 156 P. 921. They are at the present time arrived at by an entirely different method.

The tax for government purposes, either state or local, was at the time of this bond issue covered by chapter 6, title 106, Comp. Laws 1917 (section 5992 et seq.). The various governmental units, including the state, determine how much will be required for various governmental purposes. Such rate is then placed upon the taxable property within that unit which will raise that amount with a margin for delinquencies. The drainage taxes, so called, are not arrived at by any rate of valuation, but the total requirements for the various items which the district has to meet are divided pro rata on an acreage basis and in proportion to the benefits which it has been adjudged that each tract will enjoy. On the other hand, we had taxes on certain kinds of property, such as sheep and cattle, for the payment of bounties, which tax laws go back at least as far as 1901. These may have been thought of as special taxes which were based upon a percentage of the value of livestock. Such taxes would have to be included in the individual's tax notice accordingly as to whether he owned any livestock of the kind upon which the tax was based. Then, too, there are from time to time special taxes to meet principal and interest payments on district schools. So an office may be found for the advertence in sections 6010, 6012, 6021, and 6055 to special taxes.

On the other side of the argument, it is urged, and correctly, that the words "in the same manner" do not necessarily require the construction that the procedure be an identical procedure but require only that the *manner* of collecting the drainage tax shall be the same as the manner for collecting the general tax. The word "same" is defined by Webster's New International Dictionary as meaning not different in kind; like in quality. If the word "same" is correctly used in connection with an object, it does not mean similar. It means the identical object. The same book would mean the identical book which is being thought of on the two different occasions. On the other hand, the same manner means the identical manner. That is, the manner

must be identical, but the proceeding need not be identical as long as the two proceedings are identical in the manner in which they are carried out. In short, the thing which must be identical is the manner applied to the proceeding and not the proceeding itself.

When it comes to the phrase "at the time," there again the meaning must be gathered from the contents of the law itself and the practical considerations which enter into its execution. Many times the phrase is used not in the sense of exact simultaneity, which would be impossible of performance. If it were given the strictest interpretation, it would defeat the argument of the appellants. A person who was at the treasurer's window and desired to first count out the money or give a check for the general taxes and then later follow it by handing over the money or a check for the drainage taxes would not be paying at the same time according to the strict construction, because while he might have a receipt covering both amounts, he would not have paid at strictly the identical instant. These words must be given a reasonable construction.

It is of significance that in 1896, when what was later designated chapter 6, title 106, Comp. Laws 1917, was first passed, the Drainage District Law adopted in the same year (chapter 132, Laws Utah 1896) provided for a different method of fixing the "annual tax" for construction and maintenance of the drainage system than on a basis of "assessed" benefits. The board of directors of the district were required to prepare a statement and estimate of the amount necessary for the year for constructing, maintaining, and managing the drainage system and to certify it to the county clerk whose duty it was

"after having extended the valuation of property on the assessment rolls he shall levy such per cent as shall as near as may be raise the amount required by the board; which levy shall be uniform on all lands within said district as returned on the assessment roll thereof, and the collector or other county officer authorized by law to collect county taxes is hereby authorized and required to place the same on the tax

roll of the county, and said tax shall be collected by the collector as the county taxes are collected, * * *

"Sec. 11. All drainage taxes levied and assessed under the provisions of this act shall attach to and become a lien on the real property assessed from and after the thirty-first day of August. Drainage taxes shall become due and delinquent at the same time and shall be collected by the same officers in the same manner as State and county taxes."

Here was a levy on the lands uniformly on a percentage basis after the fashion of the levy of general taxes. It was not until the 1905 Session Laws that the feature of bonding appears, but the same method of taxing the land for the sinking fund and interest requirements was retained. It was not until Comp. Laws Utah 1907, that the method of basing the "tax" on a proportion of benefits was passed. See section 774, Comp. Laws 1907. It was in this section that the words, "and it shall be the duty of the county treasurer to collect such taxes at the time and in the same manner that the said county taxes are collected," appear, although it had been provided as far back as 1896 that, "drainage taxes levied shall become due and delinquent at the same time and shall be collected by the same officers in the same manner as State and county taxes." It will be noted, however, that before 1907 there was a duty imposed by the Drainage District Law itself to extend the ad valorem levy on the assessment rolls. When the basis for calculating the annual drainage installment was changed in 1907, so as to make it proportional to the benefits assessed rather than on an ad valorem basis, it may well be that at that time the Legislature had in mind that, being no longer based on a direct percentage of the value of the property, and consequently no longer includable as a part of a total percentage levy with state and county taxes so as to obtain by a simple mathematical calculation a total tax, that the tax procedure should be separated, although assimilated to the method of collecting general taxes. Certainly the language of that part of section 11, chap. 132, Laws of 1896, above

quoted, furnishes more ground for the argument that the drainage taxes were to be included in the total with other taxes than does section 774, Comp. Laws 1907, (the basis of our present law) which provided that drainage taxes were to be proportioned on the basis of benefits conferred. It may well be that when the departure occurred in the scheme of determining drainage taxes in 1907 from that previously in force, the Legislature contemplated a separation of the two taxes, and that they should travel over similar but parallel courses of procedure rather than over one course together with the general taxes as part of an integral total.

Giving weight to all the elements which enter into the argument of appellants for construing these phrases the way they would have us interpret them, the ambiguity or doubt as to the intention of the Legislature presents distinctly a typical case for the application of an argument ab inconvenienti. It is well stated in the case of *State* v. *Board of County Commissioners of Cascade County*, 89 Mont. 37, 296 P. 1, at page 15:

"It is the duty of this court to construe a statute so that its constitutionality may be sustained, if that be possible. * * *

"It is also the duty of a court to ascertain the intention of the Legislature and to so construe the statute as to give it the effect of that intention. * * * But this intention of the Legislature may not be ascertained from the wording of any particular section of a statute, but only from a consideration of the act as a whole; the division of a statute into sections being merely a matter of convenience for the purpose of reference. * * *

"In construing a statute, where the language used is not clear, the court ought to consider the effect and consequences which will follow its determination."

The court quotes from Lewis' Sutherland on Statutory Construction (2d Ed.) vol. 2, par. 487 et seq., as follows:

" 'In the construction of statutes, where the language is obscure or ambiguous, or for any reason its precise intent is not plain and cannot be made so by the context or other statutes in pari materia, the effects and consequences enter with more or less force into considera-

tion. ·* * * A result which may follow from one construction or another of a statute is always a potent factor and is sometimes in and of itself conclusive as to the correct solution of the question as to its meaning. * * * Considerations of what is reasonable, convenient, or causes hardship and injustice have a potent influence in many cases. It is always assumed that the legislature aims to promote convenience, to enact only what is reasonable and just. Therefore, when any suggested construction necessarily involves a flagrant departure from this aim, it will not be adopted if any other is possible by which such pernicious consequences can be avoided. * * * In such a matter as the construction of a statute if the apparent logical construction of its language leads to results which it is impossible to believe that those who framed or those who passed the statute contemplated, and from which one's own judgment recoils, there is in my opinion good reason for believing that the construction which leads to such results cannot be the true construction of the statute. * * * A construction which must necessarily occasion great public and private mischief must never be preferred to a construction which will occasion neither. * * * Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship or injustice; to favor public convenience and to oppose all prejudice to public interests.' "

The situation of the drainage district lands in Millard county is the best illustration of what would happen if the statute is construed as appellants desire us to construe it. In the first place, it will be giving credence to an intention on the part of the Legislature that the collection of a private indebtedness—albeit encouraged by the Legislature—was to be put upon the same plane and given the same dignity as the collection of those taxes necessary for the actual functioning of government. In *Robinson* v. *Hanson*, 75 Utah 30, 282 P. 782, this court recognized the paramountcy of the principle that there should be no obstacles placed in the way of the collection of the revenue upon which the very execution and functioning of the government itself depends. State taxes, state school taxes, state high school taxes, county, city, and city school taxes, and district school taxes, are all revenues for the running of the state government or of its agencies or local divisions of government. The governmental functions exercised by a county and city

are delegated functions of the state. Schooling is also a function of the state. The collection of the principal and interest on a bond issue held by private persons is the collection, in the last analysis, of a private debt even though the state, in order to encourage development and the betterment of lands, set up a mechanism in the nature of a quasi municipal corporation in order to initiate and construct drainage systems and to borrow and collect for the payment of them. To give the above phrases the meaning which the appellants would have us import into them would result in the imposition for the collection of a private debt a barnacle upon the probable tax revenues necessary to run the government itself; and where, as is the case with the drainage lands in Millard county, many of the lands may have general and drainage taxes upon them which in the aggregate amount to more than the value of the land itself, to hold that the general and drainage taxes must be paid together or neither may be paid, will result in the state or some of its governmental units finding itself in such a situation that they cannot collect the actual necessary revenue for running themselves. The revenue collecting machinery of the state must not be loaded with heavy freight.

In view of the mischief and great public inconvenience —not to say the very stoppage of governmental functions themselves—the situation appears to us to make it desirable to construe the statutes containing the above phrases so as not to bring about such a result if any other construction is reasonably possible which would not work such consequences. Not only do we consider it reasonably possible, but as pointed out above, the very analysis of the phrases themselves make such consideration reasonable.

For these reasons we believe that the considerations for construing the statutes as contended for by the respondent outweigh the reasons given by the appellants for construing the statutes as contended for by them. Consequently, in spite of the case of *Moore* v. *Gas Securities Co.* (C. C. A.) 278 F. 111, which it may be urged construes the statutes as

contended for by appellants, although it is distinguishable because of the requirement that payment of both taxes be entered on the same receipt, we hold that the phrases "at the time" and "in the same manner" do not mean that the two sets of taxes merge into one and must be treated as a lump sum for the purpose of collection, but hold that the words meant the same before the amendment of 1921 as the amendment itself specifies, and that said amendment was for the purpose of clarifying and not changing the law. My associate, Mr. Justice FOLLAND, points out another circumstance which appears to reveal a very definite need and purpose for the 1921 amendment of section 2058. In 1919, section 6018 was amended (Laws 1919, c. 121) to provide that sales of delinquent taxes had to be made to the county, whereas before that time private individuals could bid in the land for the taxes. The consequence of this amendment was that lands for drainage taxes, having to be sold in the same manner as lands for delinquent general taxes, also had to be sold only to the county. This was remedied in 1921 when sales for delinquent drainage taxes by the very provisions of section 2058 were permitted to be made to private individuals. This permitted the drainage district to obtain its taxes whilst the land sold for general taxes went to the county, where it reposed for four years awaiting auditor's deed before anything might be realized on it, unless assigned to a lienholder according to the provisions of section 6023, Comp. Laws 1917, as amended by chapter 122, Laws Utah 1919. It made it distinctly necessary that sales for delinquent drainage taxes be not made in the *same manner* as sales for general taxes. This appears to us to be the most probable reason why section 2058 was amended in 1921 and not to make a separation on the theory that such separation was not permissible by law before 1921. After the 1919 amendment of section 6018, it became very necessary to specify. It follows, therefore, that there can be no impairment of the obligation of contracts and no contravening of section 10, art. 1, of the Con-

stitution of the United States, because the tax officials in 1920, before the enactment and after the amendment, followed a procedure which was justified by the statutes throughout, and followed the method of assessing, notifying, levying, and collecting taxes as the same was in force at the time of the issuance of the bonds.

We now come to our study of the second point, which we divide into three parts: (a) Was the lien given by section 2072, Comp. Laws 1917, extinguished by the auditor's deed to the county for the 1926 taxes? (b) Was the lien for the annual installments already accrued given by section 2058, Comp. Laws 1917, extinguished by the auditor's deed? (c) Is the land, after auditor's deed, liable for future assessments for the annual installments for bond sinking fund and interest (section 2055, Comp. Laws 1917), and especially (1) while the lands are in the county, and (2) after they repose again in a private individual? We will take up these questions seriatim.

The first question depends upon the nature of the right given by section 2072. The section states that whenever bonds shall be issued in accordance with the provisions of the law they shall

*"constitute a lien upon all of the lands and improvements thereon within the boundaries of the district;* and the board of supervisors of said district shall, from time to time, as hereinafter provided, levy a sufficient tax to pay the annual interest charge on said bonds, and, in addition thereto, such an amount as a sinking fund which shall, in the course of events and ultimately, amount to a sufficient sum to redeem said bonds."

It is unscientific, in analyzing a problem, to deal with words rather than the conception which the words imply. When we come to ask ourselves what the word "lien" means, as used by this section, we find that it can be nothing more than a right to compel the supervisors to compute the annual charge against each tract of land and to have the county treasurer apply the tax collecting machinery to collect it.

By the ordinary definition, a lien means a right to have recourse to the thing in regard to which the lien applies for the payment of a debt; or, to use the statutory definition given by the state of Montana, "a charge imposed in some mode other than by transfer in trust upon specific property by which it is made security for the performance of an act." The drainage district bondholders, if their debt was not paid, could not foreclose directly against any of the lands. Their sole remedy would be to compel assessment to meet sinking fund and bond interest requirements, and then only up to the amount of the so-called assessed benefits. See *Campbell* v. *Millard County Drainage Dist. No. 3*, 72 Utah 298, 269 P. 1023. True, they may have the right under the 1917 law to include in the annual installments against each piece of land its proportion of delinquencies arising from the refusal of others to pay assessments on their lands as long as they do not exceed the limit of the assessed benefits, because it was not until 1919 that the law was amended to limiting the amount for delinquencies to 15 per cent additional each year. The 1917 law, in section 2072, provided that in addition to the interest charge, there should be levied such an amount as a sinking fund, "which shall, in the course of events and ultimately, *amount to* a sufficient sum to redeem said bonds," and no limitations was fixed for the amount which could be added for delinquencies. Consequently, the principle laid down in the case of *Nelson* v. *Board of Commissioners of Davis County*, 62 Utah 218, 218 P. 952, would not be strictly applicable, as it appears to be founded upon the implication that the power to assess lands for delinquencies is limited to 15 per cent of each year's levy for current sinking fund and interest requirements. For that reason, I cannot agree with the statement contained in the main opinion that under the 1917 law the "delinquent assessments for the payment of the bonds and interest may not be included in future assessments made against the other lands of the district." However, that does not need to be decided in this case. The point to be im-

pressed is that the only remedy that the bondholders have against the lands in the district for collecting their bond interest and principal is to compel the annual levy and its collection through the machinery provided by law for the collection of general taxes. Since each tract of land is chargeable only with its proportion of the total sum necessary to pay current interest and sinking fund requirements with the addition of its proportion, perhaps, of total delinquencies, it transpires that there is no way in which the bondholders can subject any piece of land in the district to the payment of their debt even up to the limit of the assessed benefits, except proportionately, and except by the use of the tax collecting machinery. That is to say, there is no method by which the bondholders can directly or through court action take a certain portion or all of the lands in the district and collect their full indebtedness from such lands, even though they do not exceed the limits of the assessed benefits. The only method is to charge each tract with its share in proportion to the assessed benefits and collect it through the tax collecting machinery. The method of doing this will be later discussed.

As we shall see, the tax collecting machinery embraces a method of foreclosing a lien for taxes or charges against the land, just as a mortgage owner has a method in equity of foreclosing his mortgage. But the fact remains that the language, "shall constitute a lien upon all of the lands and improvements thereon within the boundaries of the district," does not mean what it appears to mean. It does not mean that the bondholders have an unlimited right even up to the limit of the assessed benefits to subject all or any of the lands to foreclosure except through tax procedure for what is owing. A lien proper would permit a lienholder to create a fund from the sale of said lands for the payment of his debt. If a number of tracts were pledged as security for his debt, he could subject all of them to foreclosure and sell any or all until his debt was fully satisfied. But in the case of bondholders of a drainage district under the 1917 law,

the bondholders in the first place cannot proceed directly against the lands, nor can they charge the lands in any other way except proportionately; nor can they produce the funds from the landowners except by subjecting the lands to the provisions of the tax collecting laws. The annual charges for drainage are theoretically charges owed by each landowner benefited by the drainage project, which he is obligated to contribute to the district in order to pay his share of the indebtedness which the district owes to the creditor bondholder without right, in the absence of statutory authority, to resort to him personally for a deficiency in case the land itself does not create sufficient funds to pay his portion of the debt. But at all events, the so-called lien given by section 2072, when analyzed, is nothing but the right to subject each landowner's tract through the tax collecting machinery for the purpose of creating a fund to pay his share of the indebtedness, provided he does not make payment personally.

The first question tendered is as to whether an auditor's deed to the county for the delinquent general taxes frees the land of this right to resort to it for payment of drainage taxes. We are of the opinion that it does. This right—called a lien by section 2072—to resort to the land through tax procedure is an encumbrance against the land which, like any lien, is eliminated by the auditor's deed. And an auditor's deed clears property of all liens or encumbrances where such encumbrances result in a money charge against the land. True, the case of *Robinson* v. *Hanson*, supra, did not say that an auditor's deed given to the county or a deed by the county to a purchaser cleansed the property of all inferior liens, but simply stated that the lien for general taxes was superior. The reason why the property is cleansed of inferior liens by the auditor's deed is because the property is cleansed of all liens. When the period of redemption has passed and the auditor transfers the property to the county for the taxes, then the general tax lien is foreclosed and the lien disappears, because the county in whose favor

the lien ran itself takes the title. The lien for general taxes disappears, and so do all inferior liens or rights to resort to the land for payment of debts. Until 1927 this was the only mechanism provided by the law in order to rid the property of liens. The situation is analogous to the first mortgagee who forecloses the property. He gets a decree of sale and a sheriff's certificate just as the county or a purchaser gets a certificate of sale. After the period of redemption expires subsequent to the sheriff's sale and the sheriff's deed is given to the purchaser, the purchaser takes free from the first mortgagee's lien and all other inferior liens where the lienholders have been joined as parties to the suit and their interests foreclosed. The fund provided out of the sheriff's sale then stands as the fund out of which these lienholders must be paid, and the property is cleansed of liens. We have exactly the same legal phenomenon in the sale of property for taxes. Sales may be made from year to year for the current delinquent taxes, and up to the time that the auditor's deed is given there is a right of redemption. When the auditor's deed is given to the county, all liens or charges against the property disappear, and the county gets the title clear of liens. The auditor's deed is analogous to the sheriff's deed. Then the property stands in the place of the taxes and is itself the fund. Machinery is provided for the county to reduce the property to money, because it cannot pay debts with property.

By section 6056, Comp. Laws 1917, the board of county commissioners "may," at any time after the period of redemption has expired and before the so-called May sale, permit the redemption from any sale where the property has been sold to the county. By the 1933 Revision (80-10-68) the word "may" was changed to "shall" so as to require the county commissioners to grant redemption. This is a privilege given to save the taxpayer from the ultimate loss of his property as long as it is still within the possibility of the county to permit it, but does not change the theory that the liens are cleansed by the auditor's deed to the

county. It makes the former owner preferred as a purchaser for the taxes and penalties. Under the old law, when the property could be sold for each year's delinquent taxes and a certificate of sale given to a private person, and four years after the first sale an auditor's deed to the private purchaser, the auditor's deed to the private purchaser performed the same office as the auditor's deed given to the county where there was no purchase of the land after the current delinquency.

Under the amendments, chapter 139, Laws Utah 1921, lands could not be sold for a current delinquency to a private person, but had to be sold to the county, and certificate of sale going only to the county. The auditor's deed then went to the county and the county having title to the property sold from that point. Whatever the process, the final deed from the auditor to the county, or before the amendment of 1921, to the purchaser after four years from the first sale, cut off not only the inferior liens, but all the liens, and whatever the nature of the right or lien given by section 2072, it was extinguished. As previously analyzed, it was a right to subject through the taxing machinery each tract of land for the payment of its proportion of the indebtedness. That right is gone.

The case of *Millard County Drainage Dist. No. 3* v. *Melville*, 62 Utah 6, 217 P. 965, is not opposed to these principles. Even though the land was passed to auditor's deed for delinquent general taxes, the purchaser for delinquent drainage taxes has the right to an auditor's deed also for what that may be worth. Under section 80-10-68, R. S. 1933, it may give the holder a redemption right. It should be noted that in this case it is not necessary to determine the effect of a sale for delinquent taxes and of a certificate of sale on the liens. Whether such sale held four years before the auditor's deed was given would eliminate the liens, substituting for them an interest in the land in the taxing units in whose favor the liens existed, is not up for decision. Suffice it to say that in this case the property had not only

passed to auditor's deed, but to a private purchaser by sale from the county.

We now come to question (b) as to whether liens given by section 2058, supra, which atttached before the auditor's deed, are extinguished. It follows from what has been said above that it must necessarily have been extinguished, because all liens are extinguished.

As to subdivision (c) (1), is the land free from any liability for future assessments for drainage taxes while it is in the county? The solution of this question also follows from what has been said above. Since the right to tax the lands yearly under section 2055, Comp. Laws 1917, is a right which is derived from the so-called bondholders' lien given by section 2072, that is, since it is a right which is in effect only the means of executing the overarching right given by section 2072, and since the overarching right has disappeared, then the means of executing that right has also disappeared. If the right disappears, the method for enforcing the right has no longer anything to operate on. The matter may be approached in a different way. As analyzed above, each tract of land is in a sense a fund up to its assessed benefits out of which the landowner's proportinate share of the entire bonded indebtedness and interest is payable. It is in that sense similar to a bequest which is a charge on a certain piece of land and not on the general funds of the estate, or similar to the case of a debt which is payable out of certain funds as they arise, such as the purchase price of a mine to be paid out of proceeds of the mine. If the property upon which the bequest is a charge is sold for taxes, the bequest disappears. Or if the funds out of which the debt is to be paid are dissipated or do not arise, there can be no collection of the debt, and although the debt may theoretically exist, a debt without a means of collection is to all intents not existent.

Here, applying these principles to the present case, we find that we have tracts of land which are in a sense so many separate funds out of each of which a proportion of

a total debt may be reclaimed; that is to say, the total indebtedness may resort to each piece of land through certain procedure for its share of that total debt. In that sense, it is a charge against each tract of land for its share. If the land is sold for the general taxes, this charge is extinguished from that land just as a lien would be.

Under the 1917 laws, it may be that all of the lands which do not go through the cleansing process, that is, the lands which have not defaulted in their taxes and gone to auditor's deed, perhaps, may be charged with the accumulated delinquencies, but as fast as they fall by the wayside, these proportional increased charges against these lands are also extinguished. This process continues until the lands either pay up to the limit of the assessed benefits or go to auditor's deed. In either case, if the process continues long enough, all of the lands finally become freed of their proportional charges, and any debt which remains is uncollectible unless it may be able to operate through equity against the district as a corporate entity and have distributed or administered for the purposes of all the bondholders any of the assets to which the entity itself owns title.

This analysis reveals that in a sense parts of the total indebtedness may disappear as a practical matter when the funds, or, what is equivalent, the lands against which the indebtedness is proportionately a charge themselves disappear as no longer susceptible as a resource for the collection of such proportional parts of the total indebtedness. Theoretically the debt may exist for the purpose of obtaining a judgment against the entity, but it does not exist for the purpose of obtaining any deficiency judgment against the landowner who previously owned the land, or the new landowners who have taken the land freed from the liens and freed from any right to resort to said lands. Thus the land, having been put through the process of extinguishing from itself the charge or the right to collect a proportional part of the whole indebtedness by the land going to auditor's deed, is not available for any future drainage taxes for the pay-

ment of such proportional indebtedness, the very right to resort to said land for the payment of any proportion of said indebtedness having been extinguished.

It follows from what has just above been said that if the right itself to resort to the land for the furnishing of funds to pay any further portion of such indebtedness is extinguished by the auditor's deed, that it is extinguished regardless of whether the title of the lands is in the county or a private individual. The right which attached to the land having itself been extinguished, no further steps for the enforcement of that right may be taken. And the procedure under section 2055 is only a means of enforcing that right.

FOLLAND, Justice (concurring).

I concur. The opinions of Mr. Justice MOFFAT and Mr. Justice WOLFE reach the same results by different methods of approach and with different emphasis. Any conflicts between them appear to be of minor importance so far as affecting the result. I concur in both opinions.