# HUDSON v. MOON et al.

No. 2246.   Decided February 24, 1913 (130 Pac. 774).

1. BILLS AND NOTES—ACTIONS—BURDEN OF PROOF. Under Comp. Laws 1907, sec. 1576, providing that every negotiable instrument is deemed *prima facie* to have been issued for a valuable consideration, the production of the note and proof of the signature make a *prima facie* case of a valuable legal consideration, placing the burden on defendant of producing evidence to overcome such case, but, when such evidence is produced, the burden is on plaintiff to show by a fair preponderance of all the evidence a legal and valuable consideration.   (Page 380.)

2. PLEADING—REPLY—CONSTRUING IN CONNECTION WITH COMPLAINT. The complaint and reply should be taken together in determining the cause of action stated.   (Page 381.)

3. BILLS AND NOTES—ANSWER—MATTERS IN AVOIDANCE. In an action on a note, allegations in the answer that the consideration was an illegal one, growing out of a gambling transaction, was not new matter by way of confession and avoidance.   (Page 381.)

4. BILLS AND NOTES—ACTIONS—BURDEN OF PROOF. While a party suing on a negotiable instrument need not allege a specific consideration, where he does particularly allege the consideration, it must be proved as alleged.[1]   (Page 382.)

5. GAMING—NOTE AND MORTGAGE—VALIDITY. Plaintiff, through defendant as broker, sold stock short, to be delivered within thirty days. The broker, without authority from plaintiff and before the stock had increased in price, delivered stock to the purchasers. Thereafter, and before the expiration of the thirty days, the stock almost doubled in value. The broker then settled with plaintiff on the basis that it would be necessary to purchase stock at the then price for delivery to the purchasers, and took a note and mortgage from plaintiff for his loss on this basis. *Held*, that the note and mortgage were void for want of consideration; there being no necessity to purchase stock, as the purchasers had already received their stock, and the effect of the transaction being to enable the broker as against his principal to make a profit amounting to the difference in the market price.   (Page 385.)

6. GAMING—GAMBLING CONTRACTS—SPECULATIVE TRANSACTIONS. A short sale of stock by a customer to a broker without any deliveries being made or intended, the intention being to receive

---

[1] Leavitt v. Thurston, 38 Utah, 351, 113 Pac. 77.

or pay the difference between the contract price and the future market price, was illegal, and a note and mortgage given to cover such difference in price were void. (Page 390.)

7. CONTRACTS—EFFECT OF ILLEGALITY—RECOVERY OF TAXES. Where a mortgage was void because based on no consideration or on an illegal consideration, the mortgagee was entitled to recover taxes paid by him on the property. (Page 391.)

APPEAL from District Court, Third Judicial District; *Hon. C. W. Morse,* Judge.

Action by Charles E. Hudson against A. T. Moon, Lillian M. Moon and others.

Judgment for plaintiff. Defendants named appeal.

REVERSED AND REMANDED, WITH DIRECTIONS.

*C. S. Patterson* and *E. A. Walton* for appellant.

*Edwards & Ashton* for respondent.

LOOFBOUROW, District Judge.

Respondent brought this action in equity to foreclose a real estate mortgage of $2750 and interest from March 28, 1902, and to recover a judgment on another note of $1341 and interest. Both notes were signed by appellant Moon, and were payable to respondent. They together represent a single transaction.

The complaint, in two counts—the first on the note and mortgage, and the second on the other note—was in the usual form. Moon, answering, averred that the only consideration for the notes was an illegal one growing out of a gambling transaction between him and respondent. He set up with much detail the particulars of the claim, which briefly stated, is in effect as follows: Between February 28 and March 15, 1902, Moon, for the purpose of gambling with Hudson on the future market price of Daly West Mining Company stock, and without any intention on the part of

either that there should be a delivery of the stock, "shorted" two hundred shares of such stock to Hudson, evidencing the transaction by the making of the instruments, Exhibits D and E, hereinafter set forth. Respondent, in his reply, specifically set forth what he claimed to be the consideration for the notes. The substance of his allegations in that respect is: On February 28, 1902, Moon gave him, as a stockbroker doing business in his own name and also in the name of Hudson & Sons, an order to sell on the Salt Lake Stock Exchange one hundred shares of such mining stock for delivery at any time within thirty days from the sale, at the option of Moon. In pursuance of such order, respondent on February 28th sold fifty of such shares for the account of Moon at $19.65, thirty days; and on March 3d he similarly sold the other fifty shares. On March 15th Moon gave him a similar order to sell an additional one hundred shares, and, in pursuance thereof, respondent in the same manner sold one hundred shares at $18.75, thirty days. Respondent further alleged that Moon was notified of such sales, and that he deposited with respondent $400 as a margin for the same; that the stock rapidly advanced between March 20th and 28th; that on March 28th Moon ordered respondent to close the deals, and to purchase two hundred shares of the stock; that, in pursuance thereof, respondent purchased two hundred shares, and delivered them to the parties to whom he had theretofore sold such stock; and that the notes and mortgage were given to respondent in settlement of the balance due him on account of the difference between what the stock was sold for and the price of it on March 28th.

The court made findings in favor of respondent in conformity with the allegations of his complaint and the reply, and entered judgment and decreed a foreclosure accordingly. Moon appeals. He assails the findings.

This being an equity case, and the appeal being on questions of both law and fact, it is important at the outset to determine whether respondent or Moon had the burden of proof with respect to the consideration of the notes. Each

contends that the other had the burden.   Respondent ar-
gues that by reason of the negotiability of the notes there
is a presumption, under Comp. Laws 1907, sec. 1576, of a
valuable consideration.   That section provides:

"Every negotiable instrument is deemed *prima
facie* to have been issued for a valuable considera-
tion, and every person whose signature appears there-
on to have become a party thereto for value."

Respondent urged that "there can be no question but what
the burden of proof of establishing the illegal consideration
under the issues of the case were upon the defendant."   But
the authorities cited by him (1 Ency. Pl. & Pr. 848.; 31 Cyc.
678) to not go to this extent.   They only are to the effect
generally that, where a defense proceeds by way of confes-
sion and avoidance, the burden as to such defense is upon
the defendant.   Respondent further argues in his brief:

"And the defendant is only entitled to rely upon those
defenses set forth in his answer; therefore, if the plaintiff
in the case by *all the evidence introduced shows by a pre-
ponderance of the evidence* substantially the consideration
alleged in the complaint and reply, then he is entitled to re-
cover in this action, unless defendant proves by the pre-
ponderance of the evidence the truth of the allegations set
forth in the answer, to wit, that the consideration was an
illegal one as growing out of a gambling transaction."

Just what respondent means by this is not clear.   While
he has asserted that on the issue of consideration the de-
fendant has the burden, yet he, in effect, seems to concede
that the plaintiff has the burden to show the consideration
as alleged by him in the complaint and reply, and, if he does
so show it by a preponderance of "all the evidence intro-
duced," he is entitled to prevail, unless the defendant by
"the preponderance of evidence" proved an illegal consider-
ation.   Thus, according to this notion, the plaintiff has the
burden to prove the consideration as alleged by him in his
complaint and reply, and the defendant to prove it as he
alleged it in his answer.   This apparently on the assump-
tion that the defense of consideration pleaded here is not

inconsistent with, and is not in denial of, respondent's allegations concerning consideration, but consists of new matter avoiding the effect thereof. But immediately following this quotation from respondent's brief appears the following:

"And in this connection it is but proper to remark that, if the plaintiff in the case by a preponderance of the evidence supported the allegations of the complaint and reply, in the very nature of things, the defendant must fail in establishing by a preponderance of the evidence the allegations of the answer."

Certainly; for, if the respondent by a preponderance of all the evidence supported his allegations of consideration as alleged by him in his complaint and reply, it is somewhat difficult to perceive how the appellant's allegations of consideration could also be supported by a preponderance of the evidence. But by this confession the respondent has destroyed his claim that the defense of consideration as pleaded was new and affirmative matter, and not merely in denial of or inconsistent with respondent's allegations.

Appellant insists that the respondent having alleged a particular consideration for the notes, and the appellant that there was no consideration except an illegal one, a gambling transaction, such defense is not new matter by way of confession and avoidance, but is in denial of respondent's allegations because inconsistent therewith; and hence that the burden of proof in the first instance was upon and continued to remain with the respondent.

The complaint and reply, of course, should be taken together in determining the cause of action stated.     **2, 3** (*Barrett v. Butler,* 5 Kan. 355.) The pleaded defense was not new matter by way of confession and avoidance. (*Corby v. Weddle,* 57 Mo. 452.)

In this case it was not necessary for respondent to allege the specific consideration, because, under the statute referred to by him, a consideration was implied from the negotiable quality of the notes sued on. But it seems that when such a particular allegation is made it must be proved

as alleged. (Gould, Pleadings, 152, 154; Stephens on Pleadings, star page 423; *Dickensheets v. Kaufman,* 28 Ind. 251, 253.)

An instructive case directly in point on the question of burden of proof is *Perley v. Perley,* 144 Mass. 104, 10 N. E. 726. There the suit was upon a promissory note given by defendant to plaintiff. The plaintiff put the note in evidence. The defendant then offered evidence tending to show no consideration. The plaintiff then put in evidence for the purpose of showing the particular consideration. The court, holding that the burden of proof was upon the plaintiff, said:

"While the burden of proof in an action upon a promissory note, as between the original parties, is upon the promisee to establish the fact that it was given for a valuable consideration, the production of the note and proof of the defendant's signature establish a *prima facie* case which entitles the plaintiff to a verdict. But the burden of proving a consideration still remains upon the plaintiff, notwithstanding the presumption, and, if there is any evidence in the case on this point on behalf of the defendant, the plaintiff must show, by a preponderance of the whole evidence, that the note was given for a valuable consideration. (Citing cases.) Where a party having the burden has given competent *prima facie* evidence of consideration, and the adverse party seeks to meet it, not by producing proof that would negative this proposition, but by establishing another and distinct proposition, the burden is upon him. Thus, if the defendant should seek to meet the *prima facie* case made by the production of the note by evidence of payment, the burden would be upon him to show it. . . . But evidence on behalf of the defendant may distinctly meet and tend to disprove the evidence of consideration of the plaintiff, even if it also tends to establish an entirely different state of facts from that on which the plaintiff seeks to base his proof of consideration. In such case the effect of proof of consideration by the plaintiff is not avoided, but is met and encountered; and, even if the evidence of the defendant tends to establish a different proposition from that asserted by the plaintiff, it is still for the plaintiff to sustain the burden which rests upon him of proving the consideration, and not for the defendant to show that it does not exist, by satisfying the jury that his own proposition is correct."

In *Huntington v. Shute,* 180 Mass. 371, 62 N. E. 380, 91 Am. St. Rep. 309, that court again said:

"The rule is well settled in this commonwealth that, in an action on a promissory note, the burden of proof is upon the plaintiff to establish the fact that it is given for a valuable consideration. While the production of the note, with the admission of proof of the signature, makes a *prima facie* case, yet if the defendant puts in evidence of a want of consideration, the burden of proof does not shift, but remains upon the plaintiff, who must satisfy the jury, by a fair preponderance of the evidence, that the note was for a valuable consideration."

The same proposition is also well stated and well reasoned in *Delano v. Bartlett,* 6 Cush. (Mass.) 364. In the case of *Atlas Bank v. Doyle,* 9 R. I. 76, 98 Am. Dec. 368, 11 Am. Rep. 219, the court said:

"The burden of proof is indeed on the plaintiff to prove a valuable consideration, but by presenting the paper he makes a *prima facie* case; that is, a case sufficient to justify a verdict for him if the defendant does not rebut it. But, if the defendant does produce evidence to rebut this presumption, the burden is still on the plaintiff, taking all the testimony together, to show a valuable consideration by a preponderance of the evidence on his side."

The following cases are also to the same effect: *Search v. Miller,* 9 Neb. 26, 1 N. W. 975; *Clark v. Hills,* 67 Tex. 141, 2 S. W. 356; *Gutta Percha, etc., Co. v. City of Cleburne* (Tex. Civ. App.), 107 S. W. 157; *Small v. Clewley,* 62 Me. 155, 16 Am. Rep. 410; *Goodenough v. Huff,* 53 Vt. 482; *Manistee Nat. Bank v. Seymour,* 64 Mich. 59, 31 N. W. 140; *Bogie v. Nolan,* 96 Mo. 85, 9 S. W. 14; *Campbell v. McCormac,* 90 N. C. 491; *Conmey v. Macfarlane,* 97 Pa. 361; *Best v. Rocky Mt., etc., Bank,* 37 Colo. 149, 85 Pac. 1124, 7 L. R. A. (N. S.) 1035; *F. L. & T. Co. v. Siefke,* 144 N. Y. 354, 39 N. E. 358; *Smith v. Sac County,* 11 Wall. 139, 20 L. Ed. 102. And in principle to the same effect are *Leavitt v. Thurston,* 38 Utah, 351, 113 Pac. 77; *Scott v. Wood,* 81 Cal. 398, 22 Pac. 871; 1 Daniel Neg. Inst. 164; 4 Wig. Ev. sec. 2493.

Respondent has cited no case or authority which makes against these authorities. He has only cited 1 Pl. & Pr. 848, and 31 Cyc. 678. But they are to the point that the burden is on the defendant on pleas of payment or other affirmative

matter in avoidance or set-off or counterclaim. He has cited no case that upon issues as here the burden of proof—the *onus probandi*—was not on the plaintiff to show a valuable consideration, but on the defendant to show an illegal or no consideration. There are, however, a number of cases which seemingly hold that on a plea of a want, failure, or illegal consideration the burden of proof is on the defendant to prove it. (8 Cyc. 225.) But on an examination of them it will be seen that many of them refer only to the "burden of evidence," the duty of proceeding or going forward and producing or bringing forward evidence in support of the proposition of a want of or illegal consideration, and not the *onus probandi,* the necessity of establishing the existence of such fact or proposition by evidence which preponderates to a legally required extent as against all counter evidence. Hence in many of them, and as is illustrated in *Stevens v. McLachlan,* 120 Mich.. 285, 79 N. W. 627, and cases cited in 7 Cent. Dig. Bills & Notes, sec. 1654, we find it said that where a consideration is expressed, or there is a presumption of consideration, the burden of showing want or failure of consideration is on the defendant; but, when he has given evidence tending to impeach the consideration of a negotiable instrument, the burden is shifted to the plaintiff to show a valuable consideration. Now that is not in conflict, but in harmony, with the Massachusetts and other cases heretofore cited. So, when we once understand what the court means by the term burden of proof, the cases are not in conflict to such an extent as may appear on first blush. At any rate, we think the rule laid down by the Massachusetts courts to be the logical one. So on this point we hold: That in a suit on a negotiable instrument the instrument is deemed *prima facie* to have been given for a valuable consideration, and every person whose signature appears thereon to have been a party thereto for value; that upon an issue of an illegal consideration the plaintiff makes out a *prima facie* case of a valuable and legal consideration by the production of the note and proof of signature, and may then rest on the presumption of a valuable consideration; that

the burden of evidence, or duty of proceeding, if he chooses to overcome such presumption, then devolves on the defendant to bring forward evidence tending to show an illegal consideration, which, if done by him, dissipates or overcomes the presumption, then if the plaintiff seeks to overcome the effect of, or encounter, the evidence so adduced by the defendant, he is required to support the presumption by producing evidence showing a valuable and legal consideration, but in such case, and upon such proof, the plaintiff on the whole case has the burden, the *onus probandi,* of showing by a fair preponderance of all the evidence a legal and valuable consideration; and where he, as here, has specifically alleged a particular consideration to so prove it as alleged.

In the case at bar the evidence of both parties was directed to the single question of the consideration of the notes. There was nowhere in the appellant's pleadings or evidence anything by way of confession and avoidance of respondent's claim of consideration. And from what we have said it follows that the burden of proof is on the respondent to satisfy the court by a preponderance of the evidence, not only that there was a valuable consideration for the notes, but that the consideration was as alleged by him.

This brings us to an examination of the evidence adduced by the parties relative to the consideration. The respondent testified that the stock was sold in three lots on the Salt Lake Stock & Mining Exchange, two of fifty shares each and one of one hundred shares. He further testified that Moon did not deliver the stock within the thirty days for delivery, and that he bought the stock about March 28th at $42.25 per share, and let Moon have the same at that price to cover his short sales and with which to make such deliveries. As to the first parcel of fifty shares the respondent testified that that was sold to one Marix at $19.65. Shorten, another witness for respondent, testified that he was assistant secretary of the Exchange, and that from the records of the Exchange of February 28, 1902, it appeared that on that date Hudson sold to Marix fifty shares

of Daly West stock at $19.65, seller thirty. Marix testified on behalf of respondent that on that date he purchased from Hudson fifty shares of Daly West stock for future delivery, a thirty-day transaction, and that the stock was delivered March 15th. Respondent, when asked when he delivered the Marix stock, said he could not remember. No testimony was given in any wise tending to show the particulars of any sale of the next fifty shares, nor of its delivery, except the general statement of the respondent that to the best of his recollection he sold two hundred shares, and that he settled with Moon on March 28th, and let him have two hundred shares of his own stock to fill the entire two hundred shares of short sales. As to the other one hundred shares respondent testified that this sale was made to one Bamberger, a thirty-day sale; that he did not know whether he made the delivery to Bamberger before or after the settlement with Moon, March 28th. But Bamberger testified on behalf of respondent that he bought on March 15, 1902, one hundred shares of Daly West stock from respondent at $18.85 per share; that he thought it was a thirty-day sale; that his book or record showed that on March 19th there was an entry indicating that it was delivered March 19th; that the delivery as indicated by the book was made by one Oberndorfer's I-O-U for one hundred shares of Daly West stock. Oberndorfer, called by respondent, testified that on March 18, 1902, he borrowed two hundred and fifty shares of Daly West stock from Hudson, and gave him an I-O-U for it; that he afterwards took it up, and that he took up one hundred shares of it for Bamberger March 18, 1902, by delivering to him the stock on that date. Respondent further testified that the stock was worth about nineteen dollars on March 15th; that the price was fluctuating back and forth, and not until about the 20th did it go higher; that it advanced very rapidly between the 20th and 28th of March, practically doubling in that time.

Now, plaintiff does not claim that he had any authority whatever or any order to close any of these deals prior to March 28th; and it does not appear that there was any sub-

stantial loss, or, indeed, any loss, on the one hundred and fifty shares sold and delivered to Marix and Bamberger. Yet the evidence without dispute shows that the settlement for which the notes were given proceeded on the theory that there had been a loss of over twenty-two dollars a share on two hundred shares of the stock, a theory utterly inconsistent with the evidence put in by the plaintiff. That is, the theory alleged by him and on which he tried the case was that he, as Moon's broker, for him and on his order, sold "short" two hundred shares of the stock at $19.65 and $18.85, delivery thirty days, and that to meet such deliveries he alleged that Moon on March 28th gave him an order to buy two hundred shares; that on that day respondent, for such purpose, bought two hundred shares at $42.25 and delivered them to the parties to whom the two hundred shares had theretofore been sold on Moon's account; and that for this difference, and in settlement of it, were the notes and mortgage given. But respondent's own evidence does not sustain his theory, for he testified that he sold the first fifty shares to Marix; Marix, his own witness, testified that he on February 28th bought fifty shares of Hudson at $19.65, but that such shares were delivered to him on March 15th. Respondent further testified that on or about March 15th he sold 100 shares to Bamberger. Bamberger, his own witness, testified that he then bought two hundred shares of Hudson, one hundred at $18.85 and one hundred at $19; and he and Oberndorfer, another of respondent's witnesses testified that that stock was delivered on the 18th. The respondent himself testified that the stock did not advance, but fluctuated until the 20th, and between the 20th and 28th it took a phenomenal leap and doubled, or more than doubled. So plaintiff's own evidence clearly shows that on March 28th there was no occasion to purchase stock to meet deliveries of stock sold on Moon's account, for the evidence indisputably shows that such deliveries were made days before, and at no substantial loss to respondent. And, too, let it be noted that the plaintiff had $400 of Moon's money for a margin.

Nor did respondent sustain his allegation that Moon gave him an order on March 28th to purchase two hundred shares of the stock. Respondent himself in such respect on his direct examination testified:

"I bought the stock on the board and curb, and in Boston and I think in Michigan, along about the 28th of the month, and part of that stock had cost me less than the market value on March 28th. I also bought some on the market of March 28th, how much I don't remember. When Mr. Moon came in in the evening of March 28th, I told him about the stock that I had, and consented to let him have the two hundred shares to cover his short sale at $42.25, which was below the market value, and very satisfactory to Mr. Moon at that time. I knew that Mr. Moon had made a very serious loss, and I had repeatedly tried to get him to cover his stock, but he would not do it. He thought the market would go down again, and after it was found out what the trouble was, then everybody was clamoring for stock, and he was anxious to close his account. Q. What did he say in substance upon that? A. He was owing me the two hundred shares of stock, and I consented to let him in at $42.25. Q. When you say he was owing you two hundred shares of stock, what do you mean? A. I mean he was owing on those contracts two hundred shares of stock, for which I was liable to others, and had to deliver, and he consented to accept the stocks I had bought that day, and close his account at the basis of $42.25 a share, so that I could use this stock to make the deliveries on the contract."

The evidence on behalf of the respondent further shows that he was speculating in Daly West stock, buying and selling for himself as well as for others, and speculated on the difference between the Boston and the local market of such stock. Had the stock depreciated, as Moon anticipated it would, and had it depreciated say one-half, instead of advancing its full value as it did, Moon by reason of his agent's conduct, would have been entirely deprived of his profit; for, had the stock depreciated within the thirty days to five dollars or eight dollars, and had Moon tendered it,

or caused it to be tendered, to his supposed purchasers, they could well have answered that they already had the stock purchased by them. The transaction was worth nothing to Moon, even though the stock within the thirty days might have depreciated until it was valueless. And so, by his supposed agent's conduct and manipulation, Moon stood to gain nothing, but to lose everything. Notwithstanding the respondent, without the knowledge of Moon, had, in violation of his orders, long before the expiration of the thirty days, and at about the time of the sales, delivered the stock, nevertheless, when the stock was advancing and had about doubled in value, he demanded of Moon more margin. And in pursuance of that the notes and mortgage were given. But as soon as respondent had secured them, and on the same day, he closed the account with Moon, and then loaned him stock at $42.25 per share to meet the deliveries to Marix and Bamberger—so the respondent testified—when they, days before, already had their stock so purchased by them from the respondent. Was the respondent, on the transactions with Marix and Bamberger, out the difference between $42.25 and $18.85 or $19.65 on each share sold to them? He makes no such claim, and the record shows that he substantially was out nothing as to those transactions. What, then, does he seek to do? To himself make the difference as against his principal between the market price of the stock on the days when he pretended to his principal to have sold short and when he closed the deal with his principal, March 28th, a difference of about twenty-two dollars a share, or about $4400 on the two hundred shares. This the law will not tolerate. It exacts fidelity and loyalty, not disloyalty and personal aggrandizement, in fiduciary relations between principal and agent.

So, under the issues, the respondent was required to show what he alleged, that he, as Moon's agent, sold the stock short, and, as his agent, on or about March 28th, on his order purchased and delivered the stock to those to whom he had theretofore sold it, and that the sale and purchase resulted in the loss claimed. This, as has been seen, he failed to do,

and thus failed to establish the consideration alleged by him; and therefore the findings made by the court in such respect, if not wholly unsupported, are clearly against the manifest weight of the evidence.

We have thus reviewed the case on respondent's evidence, and on his theory of the case, and on the theory of the legality of the transaction. Let us now look at the case from the appellant's theory, that of an illegal transaction.

Evidence was given by Moon which, if believed, tended to show that the transaction was a gambling and illegal transaction. In some particulars he was contradicted by the respondent. In others, he was corroborated to some extent by facts and inferences. His evidence tends to show that he was speculating on the future market of the stock, in the fall of prices, by making sales of stock not in fact to be or intended to be delivered, he only to receive or pay the difference between the contract price and the future market price of the stock within a stated period. Such a transaction, of course, is illegal. Now, he did give the respondent orders to sell for him short two hundred shares of the stock, delivery thirty days. But Moon's contention is that the respondent, though he sold Daly West stock on the market to Marix, Bamberger, and divers other persons, yet, in fact, sold none on his, Moon's, account; but that the respondent in fact himself bought the stock from Moon which he had ordered sold, and that in the transaction Moon became and was the seller and the respondent, in fact, was and became the buyer. So that their relation, in fact, was not that of principal and agent, but that of buyer and seller; and that, as such, the respondent well knew that no stock was in fact to be delivered, but that only the difference between the contract price and the future market price was to be accounted for. In support of Moon's theory and testimony the following exhibits, referred to in the record as "D" and "E," were put in evidence. Exhibit D is:

"Salt Lake City, Utah, March 1, 1902. I have this day sold to Charles E. Hudson one hundred (100) shares of the capital stock of the Daly West Mining Co. at Park

City, Utah, $19.60 per share, seller thirty (30) days, according to the by-laws of the Salt Lake Stock and Mining Exchange. Certified checks for the necessary twenty per cent. of the purchase price are deposited in escrow with —— by each party to this contract, the terms and conditions of which are hereby acknowledged and accepted. A. T. Moon, Seller. Charles E. Hudson, Buyer. Reverse. March 20, 1902. Deposit as margin, two hundred dollars."

Exhibit E is similar, except the date, which is March 15th, and the price $18.70, instead of $19.60. It is upon all sides conceded that these documents refer to the transactions in question. That is conceded by the respondent himself. They are consistent with the appellant's theory, and are inconsistent with the respondent's. They on their face show the relation of the respondent and Moon in the transaction to be that of seller and buyer and not of agency. And the record, without dispute, shows that as between them no stock was in fact delivered, and a fair inference that no stock was intended to be delivered, and the undisputed fact —the most prominent one in the case—is that a settlement was made, not by a delivery of any stock, but merely by computing the difference between the contract price as evidenced by Exhibits D and E and the market price of the stock on March 28th, for which the notes in suit were given. So, whether the respondent's or the appellant's theory of the case be adopted, it is clear the respondent on neither is entitled to prevail.

There, however, is a finding by the court as to one item alleged in the complaint, on which we think the respondent is entitled to recover. The court found that the respondent, for the use and benefit of appellant, paid taxes on the property covered by the mortgage amounting to $277.48. This transaction is entirely separable from the other. We think the respondent is entitled to judgment for that, together with interest.

Our conclusion therefore is that the judgment of the court below should be reversed and the case remanded with directions that the findings and judgment be vacated; that

the court make findings in accordance with the views herein expressed; that the notes and mortgage be canceled and surrendered; and that the respondent be given a judgment for the taxes paid amounting to $277.48, together with interest at the rate of eight per cent. per annum from the 10th day of March, 1906, and costs in the court below, each party to pay his own costs on appeal. Such is the order.

McCARTY, C. J., and STRAUP, J., concur.