# UTAH LEAD CO. v. PIUTE COUNTY et al.

No. 5845.   Decided March 11, 1937.   (65 P. [2d] 1190.)

*Cline, Wilson & Cline,* of Milford, and *Henry E. Beal,* of Richfield, for appellant.

*E. C. Jensen, Geo. H. Lunt,* and *E. A. Rogers,* all of Salt Lake City, *T. A. Hunt,* of Richfield, and *G. R. Beebe,* of Junction, for respondents.

WOLFE, Justice.

This is an appeal from a judgment rendered by the district court of Piute county quieting title to certain mining claims in defendant Jacob W. Young. Young bases his claim of title on a private sale from the county after the county had received an auditor's deed consequent on alleged tax delinquencies. Plaintiff based its cause of action to quiet title on ownership which it is alleged was never divested by the auditor's deed because no tax was due at the time the redemption period terminated and because of numerous claimed irregularities in assessments.

The facts are complicated. We shall, for the reader's benefit, go back to 1924, reciting as far as possible the chronology and then, so that the legal questions may be better understood, endeavor to regroup those facts bearing on each question.

It appears in 1924 and previous thereto, there were several sets of mining claims located in Bullion Canyon in the Ohio mining district near Marysvale, Utah, some assessed in the name of Bully Boy Mining Company, some in the name of Dalton Gold Mining & Milling Company, some in the name of Utah Lead Company, several in the names of Davidow and Garrison, and some in the names of other individuals. The connection between all these companies and individuals does not clearly appear from the record, but it appears that there is no contention that the Utah Lead Company and its predecessors in interest were not the owners of all the claims involved in this suit from 1924 and prior thereto, until tax deed to the county in 1932.

On the ground covered by different groups of claims were erected mining buildings, mills, a power house, and various other improvements. There was also located mining and

mill equipment and machinery on various parts of the property of the Utah Lead Company. We hereafter denominate this as the "personal property." This becomes material because it is claimed by plaintiff that the assessments of 1924 and 1925 show that some of this personal property was assessed once in the name of the Bully Boy, once again in the name of the Dalton Mining & Milling Company, and once again in the name of Michael Barnett as agent of the Utah Lead Company, thus making a double or triple assessment of some of the personal property. In passing, it may be now stated that the exhibits showing assessments of personal property do not show the assessment by particular indentification, but only by names of objects or improvements and therefore are not definite enough for us to say they do or do not show this state of facts. Bits of evidence are pointed out to us by both sides from which we are asked to infer that there was or was not a double or triple assessment.

The contention of plaintiff that there was a double and triple assessment of a claimed excess of $650.16, goes to its point that it overpaid taxes on its personal property, which if applied to its taxes on realty would have resulted in payment of all delinquent realty taxes. To this contention replies defendant, in addition to denying triple and double assessments, that the county was not obligated to apply to taxes on one piece of property once become delinquent, an excess found to have been paid on another piece of property. We shall not pause longer in this statement of facts to further elaborate, comment, or at this time decide these issues.

To resume the recital of the facts: In regard to the personal property, taxes for the same were not paid for the years of 1924, 1925, 1926, 1927, and 1928. On July 23, 1929, Piute county advertised this personal property for sale to be held on August 9, 1929, and the notice specified that the sale would be for the delinquent taxes for "all previous years in which such delinquency exists including the years 1924, 1925, 1926, 1927 and 1928," describing without particular identification the personal property to be sold. At this point,

Mr. Sterling K. Heppler, at the time of the trial deceased, but then attorney for plaintiff, and prior to August 9th, met with the county attorney, the treasurer, and the commissioners of Piute county, and made a payment on account of the taxes on this personal property as part of an agreement to pay a certain amount every month until all the delinquent taxes on the personalty were paid in exchange for the promise of the county officials that they would postpone the sale. Heppler agreed to pay advertising costs in connection with the postponement. But just what advertising costs his understanding with the county embraced is one of the dark and disputed areas of this case. Plaintiff claims the question as to what he agreed on behalf of plaintiff to pay and what advertising costs should be charged against plaintiff by the county, becomes very important in the matter of determining whether there was an excess payment on the personal property which the county should have applied to the delinquencies on the real estate. This will be more clearly seen when we consider the figures. Including the first payment by Heppler, at the time of the agreement, of $160 made before August 9, 1929, and up to and including November 1, 1930, plaintiff paid $4,538.45 to the county. On October 1, 1930, a statement was given by the county treasurer to Heppler showing payments on account of the 1924 and 1925 taxes on certain of the personal property of $494.13, including penalties, interest, costs, and redemption fee; also the payment of $2,725.11 on account of taxes on other of the personal property for the years of 1924, 1925, and the combined personal property for the years of 1926, 1927, and 1928, with interest, penalties, and redemption fee; also the payment of $442.35 for the 1929 tax on the combined personal property, all of the personal property from the year 1926 on being combined in one assessment and notice; also a payment of $156.03 for the 1924 taxes on still other property with interest, penalties, and redemption fee to date, to wit, October 1, 1930, or a total of $3,817.62. The total payments shown to and including that date amounted to $4,038.45,

which was $220.82 more than was needed to pay the total of taxes, interest, and penalties on all the personal property for all the years of 1924 to 1929, both inclusive, but—and here is the rub—there was tacked on the tax bill a charge of $960.40 for advertising "to date," leaving still owing, according to the county's contention, the sum of $739.58. It appears this advertising bill was accumulated because the county continued to run weekly, during the period reaching from before August 9, 1929, to October 1, 1930, an advertisement of this sale on the theory that it was "keeping it alive." And it claims that it was within Heppler's agreement to pay this whole advertising bill.

On November 1st, Heppler paid another $500, thereby reducing this amount of $739.58 to $239.58. We shall return to this point in a moment. It should be noted before the fact is out of mind that one of the points defendants make to prove that Heppler agreed to pay all of this advertising bill was that after having received the bill for $960.40 on October 1st, he made another payment of $500 on November 1st, whereas, it is argued if he had agreed to pay only the cost of one publication showing postponement or just such publications as were reasonably or legally necessary to keep alive the sale for delinquent taxes—whatever that might be—he would have then made a protest. He would not, it is said, have paid more on the bill when, without the large charge for advertising, he was already overpaid $220.82. The point is of considerable potency and will be taken into consideration later if we find it necessary to decide whether the lower court was correct in finding that,

"prior to the date of sale, August 9th, 1929, plaintiff through Sterling K. Heppler and Michael Barnett, agents of the plaintiff, made an agreement with Piute County that in the event the sale be continued, plaintiff would pay in addition to the taxes, interest, penalties and costs, all advertising costs and other expenses in connection with the continued advertising for sale of said property."

If defendants are correct in their contention that an excess over what is necessary to pay delinquent taxes on one

piece of property owned by a taxpayer cannot by such tax-payer be urged as a payment on a delinquent tax on another piece of property, especially where the claimed excess is the result of installment payments on a series of delinquent taxes and the county has apportioned and paid to the other taxing units their share of the total tax collected, there may be no necessity of determining this issue of whether there were excess payments on the personal property tax delinquencies. For it must be kept in mind that plaintiff levels its assertion that there were excess payments, not only for the purpose of showing that the personal property should not have been sold for delinquencies, but for the purpose of showing that there were, if such excesses were credited thereto, no delinquencies in the real estate taxes to be hereafter considered, which would give the county a basis of selling the same and ultimately obtaining title.

We resume now our perusal of the facts. On December 19, 1930, one Whittaker, county treasurer, gave Barnett for the plaintiff receipts for $494.13, $2725.11, and $156.03, respectively, stating, and all combined showing, that all the personal property above mentioned and on which Heppler paid taxes was redeemed for the years of 1924, 1925, 1926, 1927, and 1928. Here again we must detour from our recital of the facts sufficiently long to gather the import in juxtaposition with said facts which counsel attempt to give them. Plaintiff contends, but it is not much discussed in its brief, and not at all in defendants' brief, that its complaint set forth facts and prayed for a decree quieting title in plaintiff to this personal property as well as the mining claims, and that the court failed to find or decree in respect thereto. The court made certain findings in respect to the personal property, but only to show that none of the $4,-539.23 paid by plaintiff up to November 1, 1930, was paid on the real estate, and, furthermore, that there was no excess to be so applied, thus finding against plaintiff's contention that Heppler had not agreed to pay the full advertising costs and also that there was no incorrect double or triple assess-

ment. But the court made no finding as to whether title to the personal property was in defendant Young or the plaintiff, although this personal property was covered by the deed of September 8, 1932, to Young together with the realty.

We find that plaintiff in paragraph IV of its complaint claims certain personal property which we assume to be partly or wholly that contained in the county's deed to Young, although we have been unable to find the deed as an exhibit in the case. The advertisements postponing the date of sale of the personal property, however, carry the same descriptions as set out in the complaint and it was so contained in the notice of sale published on July 23, 1929. We may reasonably assume, therefore, that the deed purporting to convey this personal property, as well as the realty, covered property of this description. We are not exactly clear why the court did not find and decree in respect to this personalty which was located on, used in connection with the mining property, and is by the plaintiff contended (and admitted by defendants) to be in the same category as to taxation procedure as the mining claims. The prayer of the complaint appears also to ask that title to both the realty and personalty be quieted in plaintiff, although it refers generally to "the property and the whole thereof." It asks that the county's deed to Young which conveyed both the personal property and the mining claims be canceled. It would therefore seem that the issue of whether Young obtained good title from the county to both the personal property and mining claims was before the court for adjudication.

Reverting again to the facts, we shall now consider the tax history and fate of the real estate, to wit, the mining claims. We shall see how the matter of claimed overpayments on personalty is urged by plaintiff to have legally arrested the county's right to sell its real property. The real estate, for the purpose of treatment here, must be divided into two parcels, because they have a different tax history. The first consists of the majority of the mining claims be-

longing to plaintiff. The second parcel consists of the Tip Top and Comet Lodes.

A few words concerning the pleadings in regard to parcel No. 2. The finding stated that plaintiff made no claim "to be or have been at any time the owner of said Tip Top or Comet Consolidated Lode Mining Claims." Plaintiff in its complaint did disclaim ownership of said claims, but in the reply stated such allegation was by inadvert- ▮▮ ▮▮ and then endeavored to have said claims included in the action to quiet title. Technically, an allegation in a reply is to make issue with an answer or counterclaim and cannot initiate in whole or in part a cause of action. But we think the question of title to these two claims was before the court for adjudication. *Worley* v. *Peterson,* 80 Utah 27, 12 P. (2d) 579, is not in point. In that case it was recognized that allegations in the answer denied by the reply cannot aid inaccuracies or omissions in the complaint. The new matter pleaded in this reply was not a departure—it did not abandon the theory or facts pleaded in the complaint and seek new ground for a recovery. It only added to the amount of land claimed. It was not inconsistent except in the sense that it endeavored to correct a disclaimer contained in the complaint. It was held in *Hudson* v. *Moon,* 42 Utah 377, 130 P. 774, that the complaint and reply should be taken together in determining the cause of action stated. It was rightly held in *Straw* v. *Temple,* 48 Utah 258, 159 P. 44, that the plaintiffs could not enlarge the complaint by alleging the extra pay agreement in their reply. But in that case it was not a matter of correcting an error in the complaint, but in adding a different ground for recovery which the defendant was warranted in treating as surplusage. Therefore, the court's submitting to the jury such new matter as a part of a cause of action was held error. Matter in the reply which negatives the cause of action in the complaint may evidently be taken into account. *Idaho Wholesale Grocery Co.* v. *Robinson,* 54 Utah 481, 182 P. 357. In *Combined Metals, Inc.,* v. *Bastian,* 71 Utah 535, 267 P. 1020, there was

a departure, not a supplementation. In this case there was no element of surprise.

Furthermore, in this case all parties during the trial appeared to treat the Tip Top and Comet Lodes as being subject to litigation and the court, in its findings, finds facts upon which it predicates a conclusion that the ■ county took good title by auditor's deed and passed such title to Young. In consequence, the case being tried on the theory that the cause of action included these claims, we shall so treat it.

The history of the main group of claims, which for short we shall call parcel No. 1 as it relates to this case, starts with 1927. The treasurer determined that taxes on this group, then all assessed against plaintiff, were delinquent and they were sold to the county for taxes and a certificate of sale issued to it. The same group of claims was assessed, while the county held the certificate, for the ■ years 1928, 1929, 1930, and 1931. Auditor's deed to these claims was executed to the county on April 16, 1932, for the failure to redeem for taxes for the year 1927. In May, 1932, Piute county caused to be published notice of the so-called May sale of these claims (section 6056, Comp. Laws 1917, now section 80-10-68, R. S. 1933), for May 28th, 30th, and 31st. On May 24, 1932, Michael Barnett, president, general manager, and agent of the plaintiff, asked the county to postpone the May sale, claiming discrepancies as to the date of the first delinquency of these taxes and that he desired to go over the records with the Commission. The county acquiesced. There is some dispute as to his cooperation with the county thereafter, the defendants claiming that he made no effort to confer and left Utah in July, 1932; that he did not return until July, 1935. Be that as it may, the commissioners did not offer the property for sale at the May sale nor advertise it for sale thereafter, but sold it at private sale to Young on September 8, 1932, the same

day the personal property before mentioned was sold to him included in the total purchase price of $1,310 for all the real and personal property.

Regarding this group of claims, plaintiff contends that there was no delinquent taxes at the time the property was sold in 1932, because of the claimed overpayment of the taxes on the personal property which it alleged occurred as aforesaid by reason of an overcharge for advertising and double and triple taxation. We do not find ourselves called upon for solution of this phase of the case to decide whether the finding that there was an agreement that plaintiff pay the entire $960.40 for advertising and the finding that there was no multiple taxation of the personal property in 1924 and 1925 were correct. This for the reason that the county was not compelled, certainly under the circumstances of this case, even though there was such overpayment, to apply it to delinquencies already occured in the real estate taxes. In the first place, when the tax notices for 1924 and 1925 on the different parcels of personal property were received by plaintiff, it was afforded ample opportunity to take up with the board of equalization the matter of duplicate assessment. But it permitted the taxes for 1924, 1925, 1926, 1927, and 1928 to become delinquent. Then upon threatened sale, it runs an account like a mercantile store with the county for the payment of these back taxes. Then after the mining claims are sold, it asks an audit of all these payments claiming there was double and triple taxation and excessive advertising charges, claiming an overpayment which should have arrested the sale of the realty. Small wonder that the court found that plaintiff was not acting in good faith in asking for postponements in the sale of the real estate. The charge of $960.40 for what appears to have been useless and excessive publications seems out of all reason, but such excessive charge cannot be considered as required to be applied on delinquencies on other property. Even if a taxpayer made a simple overpayment of taxes on one piece of property and failed to pay on another for the same year, it is doubtful

whether it would be incumbent on the treasurer to look up such other pieces of property in the name of the taxpayer and apply the same thereto. But how infinitely more difficult and intricate where long belated taxes are paid on account to decide questions of the reasonableness of items, such as charges for advertising, and apply the excess on other delinquent taxes. If the county had incurred an expense of only $96.04 for advertising, the item might still be disputed and a contention made that some of it—but how much it might take a court action to decide—should have been applied, and, if so applied, should have served to void a sale of the other property for taxes. To make the validity of tax sales and auditor's deeds depend upon such proceedings and the determination of unliquidated claims would confuse the matter of tax collections beyond endurance. And as suggested by the defendant Young, the county has paid over to the other taxing units their proportion of the taxes and claimed overpayments collected. The county would hardly be in position to recover from those units their proportion of the remitted overpayments upon the mere showing and demand that it had concluded that a taxpayer had overpaid. It may be true that the taxpayer, as stated in 61 C. J. 970, may have a tax paid and declared invalid applied on other taxes. That is a definite assignment of a definite sum to be applied on another tax obligation. It is exactly the same as receiving it and turning it back with instructions to apply it to a tax obligation. This is just another form of coming to the tax window with a definite sum of money and paying it on a named tax obligation. But it does not present the same situation as arises when a taxpayer permits delinquencies to pile up over a series of years without question and then when the county allows payment piecemeal on an open account, to raise finally the question of overpayments on the account in order to claim that such overpayments legally prevented the county from selling other property for delinquencies or give an auditor's deed for the same. It results, therefore, that the mining claims called herein parcel

No. 1, suffered from tax delinquencies for the years 1927 to 1931, both inclusive, when the auditor's deed was given to the county.

There was no May sale of this parcel following the auditor's deed, it having been postponed at the behest of Barnett. The property was sold at private sale without the intervention of the public sale in May as required by what was then section 6056, Comp. Laws 1917, as amended by chapter 140, Laws Utah 1921. Unfortunately, no party to this case has given us any light on the effect on a private sale by the county of a failure to hold the May sale, so we have been compelled to make our own researches.

The county commissioners had no authority to sell tax title land privately until the public sale was had. The sale to Young, therefore, of parcel No. 1 was void. The case of *Columbia Trust Co.* v. *Nielson*, 76 Utah 129, 287 P. 926, 927, is rather puzzling, but we do not believe contrary. In that case the Nielsons, part owners of real estate with one Burton, conveyed in 1919, the whole of it to the Columbia Trust Company as security for a loan. In 1920 the whole property was conveyed by auditor's deed to the county for delinquent 1914 taxes. In 1923 the land was levied upon pursuant to a writ of execution issued in an action wherein the Columbia Trust Company secured a judgment against Nielson, and, at the sheriff's sale, was purchased by the trust company. In 1924 the county commissioners conveyed the property by quitclaim deed to the trust company and in 1925 the sheriff of Box Elder county executed and delivered a sheriff's deed to the trust company. This court said the lower court was in error in holding that the deed from the Columbia Trust Company by Box Elder county was a nullity because no notice of the sale was published. But this does not mean that if sale had been made to a stranger, such stranger would have gotten title. The trust company, having been a mortgagee of one-half the property and having by the foreclosure obtained the interest, if any, which remained in the original

owner, may have had a right to "redeem" in place of the owner under section 6056, chapter 140, Laws Utah 1921, and therefore a purchase from the county in 1925 after a void May sale was perhaps, in effect, only a "redemption" under said section 6056 on the theory that one standing in the place of the owner had a right to "redeem," although intended to be a private sale after a supposed valid May sale. Hence, the quitclaim deed from the county to the trust company was not given in pursuance of its right to sell privately after a proper May sale (the lower court would have been right that a sale in pursuance of such procedure would be a nullity), but was given in pursuance of the permission of the county to resell to the original owner for taxes. This court evidently held the trust company stood in the shoes of the owner. The case says,

"The Columbia Trust Company was not a stranger to the title when it received the deed to the property from Box Elder county pursuant to resolution of the county commissioners."

In the instant case, Young was a stranger to the title.

In the case of *Smith* v. *Furlong*, 160 Cal. 522, 117 P. 527, it was held that the requirement which provided that the former owner should be notified before sale by the state to another, was jurisdictional; the state could not sell without this notice. It is true that in California the taxpayer had an absolute right (as the taxpayer here may have after the passage of the amendment to section 80-10-68 by the Session of 1933, c. 62) to "redeem" as long as the state held the title, by paying taxes, costs, interest, and penalties. See, to the same effect, *Campbell* v. *Moran*, 161 Cal. 325, 119 P. 89; *Holland* v. *Hotchkiss*, 162 Cal. 366, 123 P. 258, L. R. A. 1915C, 492; *Jordan* v. *Beale*, 172 Cal. 226, 155 P. 990. In Minnesota, where the county could sell lands forfeited to the state on authority of the state auditor, it was held that those claiming title to lands so sold must prove authority from the state auditor. *Hasey* v. *Dodge*, 131 Minn. 468, 155 N. W. 640. We think the May sale was a requirement

which had to be complied with before the county could sell to a private party. The original owner and delinquent taxpayer and any person desiring to bid on the lands had a right to rely on this sale taking place. And while what is now section 80-10-68, R. S. 1933, as amended by chapter 62, Laws Utah 1933, before the amendment of 1933, appeared to make the right of the former owner to rebuy or, as it is stated in the section, "redeem," optional with the commissioners, it is still an open question whether it might not have been an abuse of their discretion to refuse to resell to the owner on payment of all taxes, etc. If this were so, then the former owner has not only a chance but what may be a right to rebuy even under the law before amendment. Moreover, before the amendment of 1933, the May sale was for the benefit of the county, in that competitive bidding might yield it a greater price than it could get at private sale and it was at that time entitled to the extra amount.

However, even though the sale to Young of parcel No. 1 was void, it left the title in the county and it cannot be quieted in the plaintiff. In order for plaintiff to show title to parcel No. 1 in itself, it must be shown that the auditor's deed was invalid. *Hanson* v. *Burris,* 86 Utah 424, 46 P. (2d) 400. This is not the case of *Fisher* v. *Davis,* 77 Utah 81, 291 P. 493. In that case, the county was not a party. Moreover, although the principle that the court will, as between two who litigate over title, quiet it in the one having the best claim to title as between the two, although actual title may be outstanding in one not a party, this does not go to the extent of requiring the court to determine which has the better title as between a former owner whose property has gone to auditor's deed and in whom there remains a chance or perhaps a right to "redeem" or buy on the one hand, and, on the other hand, a purported purchaser at a private sale from the county who has a deed from the county, the sale, however, being void and the title being in the county. That is too much like asking a court to determine whether a cow or a horse is the better animal.

But in this case, the county which still has title is a party so a finding binding on both plaintiff and defendant Young in favor of the county could be made. Since title cannot be quieted to parcel No. 1 in plaintiff, how stands its case in regard to this parcel? We believe the complaint, having all the necessary allegations upon which to found an action by plaintiff to have the deed to Young set aside on the ground that it was void and a prayer appropriate to such relief, may be taken to include such an action as well as one to quiet title in plaintiff. Moreover, the counterclaim of Young asks that title be quieted in him, so it is incumbent on us to determine that issue. And if this deed is set aside and a judicial declaration made of the voidness of the sale to Young, plaintiff may, under section 80-10-68, R. S. 1933, "redeem" by paying the taxes, costs, interest, and penalties until a proper "May sale" is made. And upon such payment, Young may recover the money he paid the county on account of these taxes. The decree should require plaintiff to pay all subsequent taxes paid by Young as a condition precedent to setting aside the deed.

We now take up the tax history and fate of parcel No. 2, the Tip Top and Comet Lodes. The findings (No. 13) hold that the tax for 1925 was not paid and that a tax sale certificate was regularly and duly issued to Piute county on February 21, 1926. It was also found that the period of redemption expired and that on April 10, 1930, an auditor's deed was duly and regularly issued to Piute county. The findings also hold that there was no May sale of these claims. On September 8, 1932, they were included in the deed from the county to Young with the so-called personal property and parcel No. 1 for the total sales price of $1,310. Thus, finally all these properties converge in Young. He paid the taxes for 1932 and the following years. Plaintiff makes the contention that the claimed overpayments on the personal property were suffient to take care of all the delinquent taxes on parcel No. 2 and should have been applied. Laying aside the question of whether on April 10,

18

1930, enough money had been paid by Heppler (he did not complete payment of the $4,539.23 until November of 1930), we have already held that any overpayments on the personalty could not under the circumstances of this case be considered as having been legally applied to delinquencies in other pieces of property so as to arrest tax sale proceedings. Therefore, such is a complete answer to plaintiff's contention in this regard. But in respect to parcel No. 2, there are other contentions. The auditor's deed of April 10, 1930, was supposed to be for the tax due in 1925. And it is admitted that the tax for 1925 was not paid during that year nor at all unless by the aforesaid overpayments. But on April 19, 1927, plaintiff paid money due for the delinquent 1926 tax and received a certificate of redemption certifying that the said claims were redeemed from sale as provided by law for the 1926 taxes. According to section 6052, Comp. Laws Utah 1917, then in force, it is provided that property sold to the county for delinquency for taxes for any particular year

"must not be exposed for sale so long as the county holds the certificate of the sale thereof, and the sale under any such assessment must be adjourned until the time of redemption under the previous sale shall have expired."

By section 6054 it is provided:

"In case property is sold to the county as purchaser pursuant to the provisions of law, and is subsequently assessed, no person must be permitted to redeem from such sale except upon payment also of the amount of such subsequent assessment, interest, penalty, and costs, unless, in the judgment of the county commissioners, the interest of the state and county will be subserved by accepting a less sum than the amount due for taxes, interest, penalty, and costs."

It is urged, in view of these provisions, that when the county permitted a redemption in 1927 for the 1926 taxes, it was estopped from asserting that there were due taxes for the year 1925. There is tenability to this argument. Plaintiff cites the cases of *Jones* v. *Sturzenberg*, 59 Cal. App.

350, 210 P. 835, and *San Diego Investment Co.* v. *Shaffer*, 137 Cal. 323, 70 P. 179, which hold that an owner seeking to redeem was justified in relying on the auditor's estimate of what was required to redeem in view of section 3817 of the California Pol. Code which permits redemption of property after sale to the state and before the state shall have disposed of the same. Respondents counter that the California statute required the auditor, upon application to redeem, to make an estimate and for that reason the taxpayer could rely on such estimate. But said California section 3817 does not by its terms require the auditor to furnish such estimate. It is inferred that he must do so because it follows that if a taxpayer seeks to redeem he is entitled to know what it costs to redeem. It was held in those cases and the cases of *O'Connor* v. *Gottschalk*, 148 Mich. 450, 111 N. W. 1048; *Menasha Wooden Ware Co.* v. *Thayer*, 150 Wis. 611, 137 N. W. 750; *Beck* v. *Meroney*, 135 N. C. 532, 47 S. E. 613, and *Ford Lumber Co.* v. *Bartlett*, 32 Idaho 638, 186 P. 709, that a taxpayer furnished with an estimate of the amount necessary to redeem could rely on it and if some item or year was omitted, the property could not legally go to auditor's deed for the year of delinquency omitted from the estimate. It is claimed that in the instant case there is no evidence of anything but a desire to pay and a simple payment of the 1926 taxes. Yet, if the treasurer was not permitted to allow redemption for the 1926 taxes unless the 1925 delinquencies were also paid, it was just as potent an inference when he permitted the 1926 taxes to be redeemed in 1927 that there were no prior taxes due, as if he had given an estimate omitting the 1925 taxes. Certainly, the taxpayer could rely on an assumption that he was safe from auditor's deed to his property for any tax before 1927. Therefore, it is the same in this case as if the auditor's deed given for the 1925 delinquent tax had been given for a paid undelinquent tax. The deed given on April 10, 1930, was too soon. The first year auditor's deed could be given for the property in parcel No. 2 was in 1932, four years after the sale for de-

linquent taxes of 1927. This deed to the county on Tip Top and Comet Lodes was therefore void and the county obtained no title to said real estate nor did Young, therefore, from the county. In consequence of what has been above said, there is no occasion for considering the misspelling of the name of the person to whom these claims were assessed or the effect of adding as an owner in the assessment one who was not, or the effect of a discrepancy in the spelling of the names occurring in the assessment and the certificate of sale.

Heretofore we have set out the facts and considered the part the tax history of the so-called personal property played as it formed the basis of a claim that a surplus served to pay the taxes on the realty. We shall now take up the question of whether the court should have found regarding the title status of this so-called personal property and if so, what it should have found and decreed.

The complaint in paragraph IV includes the personal property sold by the county in plaintiff's claim of being owner and entitled to immediate possession. Both the defendant Young and the county deny the allegations of paragraph IV of the complaint and the allegations endeavoring to show an illegal sale of this personal property. The prayer of the complaint apparently seeks to quiet title to all of the property purchased by Young and claimed by plaintiff in its complaint. It is difficult to see why the court did not find and decree as to the title status of this personal property which belongs to and apparently for taxation purposes is considered as realty and is by the respondents so admitted. Section 5936, Comp. Laws 1917, now section 80-5-64, R.S. 1933, in referring to "improvements, buildings, erections, structures or machinery placed upon any mine or mining claim, or used in connection therewith" and "supplies used either in mills, reduction works or mines" (R. S. 1933, 80-5-63), provides that "every tax is a lien upon the mines or mining claims upon which such mining machinery and improvements are erected * * * and

the sale thereof for delinquent taxes may be made as provided for the sale of real estate for delinquent taxes." We think this provision carries with it by necessary inference the provision that the county must wait four years after the certificate of sale before taking auditor's deed to such property. Personal property taxes not a lien on real property must be collected when assessed or the property seized and sold before the first Monday without a right of redemption in June after assessment. But in the case of mining machinery and improvements located on or used in connection with the mining property, section 80-5-64 goes further and provides that the sale for delinquent taxes may be made as provided for the sale of real estate for delinquent taxes. Apparently the idea was to have the improvements and machinery keep step with the realty with which it was connected in the march of tax procedure. It transpires, therefore, that four years should elapse between the certificate of sale of this sort of property and the auditor's deed. When the county was paid between August 9, 1929, and November 1, 1930, the sum of $4,539.23, even under the county's contention that there was no overcharge for advertisement or no duplicate taxation, there was due on November 1, 1929, only $239.58 on the entire tax bill for this property for the years 1924 to 1929, both included. Since the tax for 1929 was $442.35, there could have been due even under the county's contention only part of the 1929 tax, to wit, $202.77. All taxes back of 1929 had been paid, together with costs and penalties. The first year that the county could acquire a deed to this so-called personal property was, therefore, four years after the certificate of sale for the year 1929, which at the earliest would have been in 1933. On December 22, 1930, after running up the bill of $960.40, purportedly to keep alive the advertisement setting the sale for August 9, 1929, the county issued to itself a certificate of sale purporting, however, to be for the taxes of 1930. The property was afterward, on the 8th day of April, 1932, included in the deed to Young. But since no auditor's deed to this so-

called personalty issued to the county and none legally could because sufficient time had not expired, the sale to Young of this so-called personal property was void.

It is advanced that this sort of an action to set aside a supposed title in the lands of a purchaser at the tax sale and place the same back in the former owner or taxpayer must be accompanied with a tender or at least an offer to pay all the taxes legitimately owing on the property and paid by the purchaser. We held in *Bolognese* v. *Anderson*, 87 Utah 455, 49 P. (2d) 1034, 1035, in connection with the petition for a rehearing, as follows:

"It is first complained that the opinion by inference holds that in every case of a suit to quiet title the payment of all valid taxes is a condition precedent to quiet title on the part of the defendant. * * * We did not mean in that opinion to lay down any rule which would or would not require an allegation and a proffer of the taxes by any party asking to have title quieted in him as against a person claiming title by virtue of a tax deed, whether such party be a plaintiff or a defendant. That matter may well be taken care of by a court of equity if it determines that the holder of the tax title has not a good title and that the other party is the real owner, by, as a matter of equity in proper cases, requiring the real owner to pay the holder of the invalid tax deed the amount of taxes with interest and penalties which he has paid, or the amount of taxes together with interest and penalties which may have been due to the county. It was thus held in *Oregon Short Line R. Co.* v. *Hallock*, 41 Utah 378, 126 P. 394."

In a case like this, where the amount of valid taxes was disputed, it would be impossible to make a tender of the taxes which the plaintiff ought to have paid. But a court of equity may, after arriving at the proper amount which the former owner seeking to quiet title owed the county, include it in the decree and make the payment of it a condition precedent to execution of the decree. *Holland* v. *Hotchkiss*, 162 Cal. 366, 123 P. 258, L. R. A. 1915C, 492; *Jones* v. *Sturzenberg*, supra.

In consequence of what has been said above, the following conclusions seem inevitable:

(1) The findings of fact of the court below to the effect that plaintiff was obligated to pay the full $960.40 advertising costs, being on conflicting evidence on which a court might go either way, will not be disturbed.

(2) The finding that there was no double or triple taxation of personal property belonging to plaintiff or its predecessors in interest, likewise being in a nebulous area of evidence which we cannot say preponderates in favor of plaintiff's contention, the finding will not be disturbed. This sets at rest those two controverted facts.

(3) Plaintiff cannot prevail in its prayer to have the title to the real estate we have called parcel No. 1 quieted in itself. But defendant Young has set up a counterclaim praying that title be quieted in him. Moreover, the plaintiff's action, containing the necessary allegations and prayer, may be construed as including an action merely to set aside Young's deed, even though title cannot be quieted in plaintiff. It results, therefore, that we hold that Young's deed from the county is a nullity and must be set aside, the title having all the while been in the county. But as a condition of such decree, plaintiff will be compelled to pay Young all the legitimate taxes, interest, costs, and penalties paid by Young and at the same time, on such condition and simultaneous with such payment, plaintiff may, under section 80-10-68, chapter 62, Laws Utah 1933, offer to "redeem" said property from the county and the proper papers given plaintiff showing title back in it.

(4) That the title to parcel No. 2 be quieted in plaintiff subject to his paying to Young all legitimate taxes assessed against said property paid by the latter, together with costs and penalties paid by the latter with interest on such payments to time of consummation of the decree.

(5) That title to the so-called personal property be quieted in plaintiff subject to the same conditions as mentioned in conclusion (4).

The judgment is reversed and the record remanded to the lower court to make findings, conclusions and decree in accordance with this opinion.

We think the record shows plaintiff to have been so dilatory in co-operating after the accommodations of the county, and that it was in great part this delay which caused the county to proceed as it did. For this reason, equity requires that each party bear its own costs, and such is the order.

FOLLAND, C. J., and EPHRAIM HANSON, MOFFAT, and LARSON, JJ., concur.